Michael **POOLEY,** Appellant,

v.

**STATE of Alaska,** Appellee.

**No. A–310.**

Court of Appeals of Alaska.

Sept. 6, 1985.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Michael Pooley pled *nolo contendere* to misconduct involving a controlled substance in the fourth degree, AS 11.71.-

040(a)(3)(F), after state troopers found approximately thirty-three pounds of marijuana in suitcases brought by Pooley from California. The suitcases were seized at Anchorage International Airport shortly after Pooley's arrival, and opened pursuant to a warrant obtained shortly thereafter. Prior to entering his plea, Pooley moved to suppress the marijuana and other evidence seized at the same time on a variety of grounds. Superior Court Judge Victor D. Carlson denied the motion; in entering the plea, Pooley preserved his right to appeal Judge Carlson's decision on the motion to suppress pursuant to *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). While this appeal presents some difficult issues, we have concluded that the court did not err in refusing to suppress.

## I. FACTS

At 1:14 p.m., on June 27, 1983, a dark green BMW pulled up to the curb in front of the Western Airlines counter at the San Francisco International Airport. The BMW was new and had no license plate, but the license plate frame indicated that it had been purchased from a dealer in Marin County, California. In the car were three men and a woman. One man, later identified as Michael Pooley, got out of the front passenger door, then took out three new Skyway suitcases and a briefcase. Pooley made his way to the Western ticket counter and the BMW drove off. He was casually dressed, and he was wearing sunglasses, which he continued to wear in the terminal.

All of this was observed by Special Agent Thomas Smith of the California Department of Justice, Bureau of Narcotic Enforcement. Smith was standing inside the terminal near the windows about twenty feet from where the BMW pulled up. When Pooley got in line at the counter, Smith got in line behind him in order to observe. Smith later testified that Pooley appeared somewhat nervous and that he swallowed two or three times during the five or ten minutes they were in line together. When Pooley reached the agent, he produced a roll of currency from his pants pocket and purchased a one-way ticket to Anchorage for $377, paying with two fifty-dollar bills and a number of twenty-dollar bills. Smith observed that Pooley checked the three suitcases and filled out the identification tags with an address in Portland, Oregon.

After Pooley left the counter, Smith went up and identified himself to the ticket agent. He learned from her that the ticket had been issued to M. May and that the reservation had been made about three hours earlier. The agent also gave Smith the local telephone number that had been given by the person who made the reservation.

Smith had been earlier authorized to enter the baggage area of the airport. After leaving the counter, Smith proceeded to the baggage area and enlisted the aid of another agent. The other agent was using a dog to check luggage for narcotics as it passed by on a conveyor belt in the cargo area. Smith located Pooley's bags and placed them on the ground next to the conveyor belt. The bags carried identification tags with the name M. May and an address on "Genva" Street in Portland. The bags were quite light, Smith later testified. Smith placed each bag flat on the floor and attempted to feel the contents by compressing the bags with his hands. In the center of each bag, approximately twelve inches in diameter, was a bulge which would compress no farther. Smith then had the other agent and the drug-detection dog, Tug, go over the exterior of all three bags. Tug scratched and chewed at the edge of one bag, which his trainer indicated was a "weak alert" for narcotics. Smith then returned the bags to where he had found them, and left the baggage area. The entire process of locating and examining the bags took about five minutes.

After making sure that Pooley and his bags all made it on the plane, Smith called authorities in Oregon to have them check on the Portland address. They reported that there was no Geneva Street in Portland. Smith also learned that the telephone number given by the person who

made the reservation was not assigned; when Smith called the number, he got a recording saying that it had been disconnected.

Smith also telephoned airport police in Seattle and asked them to observe the passenger listed as M. May during the one-hour layover there. Authorities in Seattle could only report that M. May remained aboard the plane during the stop. Agent Smith then telephoned the office of the Alaska State Troopers at the Anchorage International Airport and reported everything that he had learned to Trooper Alan Storey.

After the flight arrived in Anchorage, Trooper Storey and other troopers watched as Pooley walked from the plane through the terminal and out into the parking lot. They apparently stopped him as he was about to get into a car there. The troopers requested identification, and Pooley produced an Alaska license in the name of Michael L. Klein. The troopers asked to see Pooley's ticket and his baggage tags; Pooley indicated he could not find them. Pooley also claimed that he had checked no baggage. The troopers then asked Pooley to come with them back into the terminal, and he did. They took him to a first aid room inside the terminal. As Pooley sat down in a chair, he appeared to be attempting to hide something. One of the troopers asked Pooley to stand up again, and apparently found the three baggage claim stubs where Pooley had been sitting. Pooley was then given his *Miranda* [1] rights, and asked if he would consent to a search of his baggage. Pooley declined. Nevertheless, the troopers retrieved Pooley's bags from the Western carousel and used a local drug-detection dog to examine them. The dog "alerted" to all three bags.

Pooley was stopped in the parking lot at approximately 6:20 p.m. He was given his *Miranda* rights at about 6:30. The drug-

detection dog "alerted" to the bags at about 6:50. At 9:10 p.m., the troopers made an oral application for a search warrant before Magistrate Paul Crowe. The magistrate issued a search warrant for Pooley's bags. Trooper Storey executed the warrant and found in the center of each suitcase a plastic bag containing approximately eleven pounds of marijuana. Pooley consented to the search of his attache case; inside troopers found various papers in the names of Michael L. Klein and Michael L. Pooley.

## II. DISCUSSION

On appeal, Pooley argues that "all evidence seized in reliance on the warrant should have been suppressed by the trial court." His argument is two-fold. First, Pooley contends that the warrant was based upon illegally obtained evidence. Second, he argues that the evidence presented to the magistrate was legally insufficient to establish probable cause for issuance of the warrant.

Both of Pooley's claims must be evaluated in light of the evidence presented to the magistrate. Alaska State Trooper Thomas Bowman testified in detail about his training and experience in an undercover capacity and his use of Meik, "scent detection canine." Bowman described the training that Meik had received and Meik's excellent record in detecting cannabis, cocaine and heroin. Bowman explained that Trooper Storey had contacted him earlier that day and asked him to check the three Skyway bags. According to Bowman, Meik "alerted" to all three bags.

Trooper Storey testified in detail about the substance of two telephone conversations with Agent Smith in San Francisco [2] and the events occurring after Pooley arrived in Anchorage. Storey was specifically asked by the magistrate what had initially aroused Agent Smith's suspicions, and

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Storey testified that Smith called him at 1:40 p.m. and gave him most of the information related above, including a complete description of Pooley and his luggage. Smith also called Storey at 4:09 p.m. to inform him that passenger M. May had not deplaned in Seattle during the one-hour layover.

Storey explained the significance of each fact or observation related to him by Agent Smith as best he could. For instance, Trooper Storey told the magistrate about the dense, compressed area in the center of each of Pooley's bags. Significantly, however, Trooper Storey did not tell the magistrate that Smith had exposed the bags to a dog sniff in, San Francisco; nor did he explain that the San Francisco dog had alerted to only one of the bags. Magistrate Crowe issued the warrant based on the reaction of the Anchorage dog to the luggage and the dog's record of accuracy.

■ To the extent that Pooley challenges the sufficiency of the evidence to support the issuance of the search warrant, we reject this challenge. The evidence presented to the magistrate was more than sufficient to establish probable cause for issuance of a warrant to search Pooley's bags.

■ Pooley's other argument is more complex. He appears to challenge the police conduct at every stage of the investigation. Yet the court would only have been justified in suppressing the evidence if it was the product of, or "tainted" by, some earlier illegality. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Use of unlawfully obtained evidence to secure a search warrant will not invalidate the warrant if it could have been issued on the basis of untainted evidence before the magistrate. *Schmid v. State*, 615 P.2d 565, 575 (Alaska 1980). Thus, if we find that some of the evidence presented to the magistrate in this case was the product of illegality, we must determine whether the remaining evidence would have been sufficient to support issuance of the warrant if the illegal evidence had not been presented.

■ Some of the conduct complained of by Pooley (*e.g.*, the use of the drug detection dog in San Francisco) did not yield evidence presented directly to the Anchorage magistrate. With regard to this conduct, it must be established not only that the conduct itself was improper, but also

that, under the *Wong Sun* doctrine, this impropriety significantly tainted some evidence that was presented to the magistrate, and finally that the warrant could not have been properly issued without this evidence.

With these considerations in mind, we evaluate the conduct complained of by Pooley.

A. Use of the Drug-Detection Dog in San Francisco

Pooley first argues that the warrant was tainted by Agent Smith's use of a drug-detection dog at the San Francisco airport.

Professor LaFave introduces the topic of dog sniffs in the following way:

> In recent years police have made extensive use of specially trained dogs to detect the presence of explosives or, more commonly, narcotics. These dogs are utilized in checking persons and effects crossing the border into the United States, luggage accompanying persons traveling by airline or bus, freight shipped by airline, and the contents of vehicles and storage facilities. In light of the careful training which these dogs receive, it is clear that an "alert" by a dog will constitute probable cause for an arrest or search if a sufficient showing is made as to the reliability of the particular dog used in detecting the presence of a particular type of contraband. The more difficult question, which is of primary concern here, is whether such use of "canine cannabis connoisseurs" or similarly trained dogs itself constitutes a search so as to be subject to the limitations of the fourth amendment.

1 W. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 2.2(f), at 280–82 (1978) (footnotes omitted).

Courts have taken a variety of approaches to the question posed by LaFave. The United States Supreme Court has eliminated some of the confusion with its recent decision in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). Place was flying from Miami International Airport to New York's LaGuardia Airport.

Something in his behavior as he waited in the ticket line aroused the suspicions of Florida law enforcement officers, and they approached him as he was walking toward the gate for his flight. The agents asked for his airline ticket and some identification; Place complied with this request and consented to a search of the two suitcases that he had checked. The agents decided not to search the luggage, however, because Place's flight was about to depart. As Place walked away, he apparently stated that he had recognized that the agents were in fact police. *Id.* at 698–99, 103 S.Ct. at 2639–40, 77 L.Ed.2d at 115.

Because their suspicions were still aroused, the Florida police inspected the address tags on the checked luggage and noted discrepancies in the street addresses. Further investigation revealed that neither address existed and that the telephone number that Place had given the airline belonged to a third address on the same street. The agents then called Drug Enforcement Administration (DEA) authorities in New York and relayed the information they had about Place. Place behaved even more suspiciously upon arriving in New York and being approached by the DEA agents. Place told the agents that he had spotted them as "cops" as soon as he got off the airplane. He also told them that the police at the Miami airport had already searched his baggage. When Place refused to consent to a search of his luggage in New York, one of the agents told him they were going to take the luggage and try to obtain a search warrant for it. The agent told Place he was free to accompany them, but Place declined and apparently left the airport. The agents took the bags to Kennedy Airport and subjected them to a "sniff test" by a trained dog. The dog's reaction was positive as to the smaller bag and "ambiguous" as to the larger bag. Because it was late on a Friday afternoon, the agents kept the luggage until Monday morning before securing a warrant and opening the bag, which turned out to contain a large quantity of cocaine. *Id.*

The question presented by the case, as the Court saw it, was how to evaluate "warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion." 462 U.S. at 702, 103 S.Ct. at 2641–42, 77 L.Ed.2d at 117. The Court agreed with the parties and the court below that the police conduct in stopping Place should be analyzed under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court went on to state:

> The exception to the probable cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures." We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*Place,* 462 U.S. at 703, 103 S.Ct. at 2642, 77 L.Ed.2d at 118. (citation omitted). The Court cited *United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (Powell, J., concurring), for the proposition that " '[t]he public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit,' " and concluded that "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope."

462 U.S. at 703, 706, 103 S.Ct. at 2642, 2644, 77 L.Ed.2d at 118, 120.

The Court recognized that the investigative procedure might itself be a search requiring probable cause, but concluded that a canine sniff of personal luggage is not a search but a limited, minimally intrusive investigative technique that should be regarded as *sui generis*. [3] The Court went on to conclude, however, that the police conduct in detaining the luggage for ninety minutes exceeded the permissible limits of a *Terry*-type investigative stop. *Id.* at 710, 103 S.Ct. at 2646, 77 L.Ed.2d at 123.[4]

The precise scope of the Court's holding in *Place* was not immediately clear. Professor LaFave points out that *Place* "does not validate the use of drug detection dogs

in all circumstances." 1 LaFave, *supra*, § 2.2(f), at 119 (1985 Supp.).[5] *See also United States v. Beale*, 731 F.2d 590, 593–95 (9th Cir.1983), *rehearing en banc ordered and opinion withdrawn*, 728 F.2d 411 (9th Cir.1984) (even after *Place*, police should have founded or articulable reason to believe that luggage may contain contraband before dog sniff); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3523, 82 L.Ed.2d 830 (1984) (*Place* court did not reach issue of whether reasonable suspicion is required). Most commentators have concluded, however, that *Place* means the fourth amendment simply is not implicated when checked baggage is detained for a very short period and exposed to canine

---

**3.** The Court stated:

We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

*United States v. Place,* 462 U.S. at 707, 103 S.Ct. at 2644–45, 77 L.Ed.2d at 120–21 (citation omitted).

**4.** Justices Brennan, Blackmun and Marshall concurred in the result, but criticized the major-

ity for reaching issues it need not have addressed, including the reasonableness of the exposure of the luggage to a narcotics detection dog. According to Justice Brennan, the Court should not countenance seizure of personal property on less than probable cause, and the question of what standards should govern dog sniffs of luggage should have been left for another day. 462 U.S. at 718–20, 103 S.Ct. at 2649–51, 77 L.Ed.2d at 128–29 (Brennan, J., concurring). Justice Blackmun was more explicit about the dog sniff question. He wrote (*id.* at 723, 103 S.Ct. at 2653, 77 L.Ed.2d at 132):

While the Court has adopted one plausible analysis of the issue, there are others. For example, a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon mere reasonable suspicion. Neither party has had an opportunity to brief the issue, and the Court grasps for the appropriate analysis of the problem.

**5.** LaFave's main point is that dog sniffs of people present a different question. The propriety of such sniffs has been repeatedly questioned. *See Horton v. Goose Creek Ind. School District,* 690 F.2d 470 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Jones v. Latexo Ind. School District,* 499 F.Supp. 223, 236 (E.D.Tex.1980); Gardner, Sniffing for Drugs in the Classroom—Perspectives on Fourth Amendment Scope, 74 Nw.U.L.Rev. 803 (1980); Comment, Search and Seizure in Public Schools: Are Our Children's Rights Going to the Dogs? 24 St. Louis U.L.J. 119, 131–33 (1979); *see also Doe v. Renfrow,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1981) (Brennan, J., dissenting from denial of *certiorari*); *Doe v. Renfrow,* 631 F.2d 91, 93 (7th Cir.1980) (Swygert, J., dissenting from denial of rehearing).

sniffing. 1 LaFave, *supra,* at 116–120 (1985 Supp.). The Eleventh Circuit Court of Appeals has recently discussed *Place* in the following way:

> Luggage, unlike a person, has no fourth amendment rights. The fourth amendment, accordingly, is implicated only when a police seizure of an item impairs a person's possessory interest, or a search impairs a person's reasonable privacy interest in the item.... [B]ecause the fourth amendment protects people, not things, courts should concern themselves with seizures of luggage only when those seizures impair the right of the possessor to freedom of movement with his luggage. In airport luggage cases, the traveler's possessory interest would be impaired if the seizure of his luggage were tantamount to a seizure of his person, whether actually, because he could not leave without his luggage, or constructively ..., where travel plans required him to proceed without his luggage. *Place* teaches that a seizure of luggage *qua* seizure, with no deleterious effects on the air traveler, is simply not a fourth amendment issue. This is in accord with a prior holding of this circuit, *United States v. Goldstein,* 635 F.2d 356 (5th Cir.), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981). In that case we held that the removal of a suspect's luggage from a baggage cart for an immediate on-the-spot sniff by a detector dog did not implicate the fourth amendment. Neither the removal of the luggage from the cart nor the sniff by the dog impaired in any way the owner's possessory or privacy interests. Privacy interests were not affected because the sniff was not a search.... The owner's possessory interests were not impaired because he had surrendered control of the luggage to the airline for some four and one-half hours, and the removal and inspection took about four minutes. The removal and inspection would not in any way have caused Goldstein or his luggage to miss or be late for the flight; in fact, had the dog not alerted, Goldstein would have been totally oblivious to the entire occurrence.

*United States v. Puglisi,* 723 F.2d 779, 785–88 (11th Cir.1984) (citations and footnotes omitted).

The *Puglisi* court's understanding of what constitutes a search was seemingly confirmed by the United States Supreme Court in the more recent case of *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). In *Jacobsen,* employees of a private freight carrier opened a package damaged by a forklift in order to examine the contents. Within several layers they found plastic bags containing a white powder. They notified DEA officials, then replaced the bags inside the layers of the package. DEA agents arrived and partially reopened the package to get at the four plastic bags. One agent opened each bag, took a trace of the powder, and field-tested it to determine if it was cocaine. It was. A warrant was eventually obtained, resulting in a search of the addressee's residence, which resulted in his arrest.

The Supreme Court concluded that the reopening of the unsealed package and visual inspection of the plastic bags enabled the agents to learn nothing that had not been learned during the private search, so that no legitimate privacy expectation had been infringed. *Id.* at ——, 104 S.Ct. at 1659–60, 80 L.Ed.2d at 98–99. Moreover, the Court held that "since it was apparent that the ... plastic bags contained contraband and little else," the warrantless seizure that resulted from the officers' exercise of dominion and control over the package was not unreasonable. *Id.* at ——, 104 S.Ct. at 1661, 80 L.Ed.2d at 99. Finally, as to the field test of the powder, the Court concluded that it was no search because it "could disclose only one fact previously unknown to the agent—whether or not a suspicious white powder was cocaine." *Id.* at ——, 104 S.Ct. at 1661, 80 L.Ed.2d at 100. This conclusion, according to the Court, was dictated by *Place.* And, because only a trace amount was taken, its seizure could have only a *de minimus* im-

pact on any protected property interest, and was thus reasonable. *Id.* at ——, 104 S.Ct. at 1663, 80 L.Ed.2d at 102.

The conclusion in *Puglisi* that possessory interests were not impaired by temporary detention of the bag is also in accord with other Supreme Court authority. *United States v. Van Leeuwen,* 397 U.S. 249, 253, 90 S.Ct. 1029, 1032, 25 L.Ed.2d 282 (1970) (one-day segregation and delay of a mailed package). *See also Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1546, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring) (emphasizing distinction between "the interest in retaining possession of property and the interest in maintaining personal privacy").

In the case at hand, Pooley's bags were separated from the other baggage on that flight for only a few minutes, and Pooley himself was oblivious to the dog sniff in San Francisco. Under the analysis put forward in *Jacobsen, Van Leeuwen,* and *Puglisi,* Pooley's fourth amendment rights were clearly not violated by Smith's conduct in segregating Pooley's bags and exposing them to the drug detection dog.

Pooley, however, takes the position that the majority's decision in *Place* is inconsistent with *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). He argues that dog sniffs like the ones in this case are searches and that this court should so hold on the basis of the more extensive right of privacy guaranteed Alaskan citizens by Article 1, §§ 14 & 22 of our state constitution. *See Reeves v. State,* 599 P.2d 727, 734 (Alaska 1979).

In *Burnett v. Anchorage,* 678 P.2d 1364 (Alaska App.), *cert. denied,* —— U.S. ——, 105 S.Ct. 190, 83 L.Ed.2d 123 (1984), we considered the issue of whether a breathalyzer is a search. We noted that in *Katz* the United States Supreme Court had abandoned the "physical trespass" approach to this question, and that the Alaska Supreme Court has adopted and frequently applied the two-prong test from Justice Harlan's concurrence in *Katz* to identify those cases where an invasion of privacy constitutes a search (first, that a person have exhibited an actual, subjective expectation of privacy

and, second, that the expectation be one that society is prepared to recognize as "reasonable"). We discussed various decisions establishing that, in reviewing requests for non-testimonial evidence, the court will look to the practical effect of the intrusion, *i.e.,* pain or embarrassment caused to the subject. We then stated:

> The ultimate question is one of value. Should a free society tolerate a subjection of citizens to breathalyzer examinations free of constitutional constraints? In a different context, LaFave suggests some good reasons for characterizing intrusions similar in nature to breathalyzer examinations as searches, for example, canine sniffs, magnetometers and x-rays.... On the other hand, in *United States v. Place,* the court held that subjecting luggage to sniffing by trained dogs did not constitute a search. The court felt that a canine sniff was *sui generis* regarding the manner of obtaining information and the limited content of the information obtained. This rationale might also apply to breathalyzer examinations since they are limited both in terms of the nature of the intrusion and the nature of the information it produced.

678 P.2d at 1368 n. 1 (citations omitted).

The gist of Pooley's argument is that Alaska courts have always adhered more closely to the tenets of *Katz,* and that *Place* is simply inconsistent with *Katz* in concluding that a sniff is not a search.

 Certainly, Pooley is not alone in arguing that the Court's recent fourth amendment decisions have moved significantly away from *Katz* in determining what constitutes a search. *See, e.g., Jacobsen,* —— U.S. at ——, 104 S.Ct. at 1667–72, 80 L.Ed.2d at 109–113 (Brennan, J., dissenting). Fortunately, we need not determine the precise scope of the Alaska Constitution's protection in this area in order to decide the issue presented by Agent Smith's use of the drug detection dog. Smith was an agent of the state of California, where this conduct occurred. The record contains no evidence that Smith's

actions were part of any ongoing or concerted effort by Alaska and California to identify and arrest persons bringing drugs to Alaska. We have determined that Smith's conduct comported not only with the law of the United States (*Place*) but also the law of California. *See People v. Mayberry*, 31 Cal.3d 335, 182 Cal.Rptr. 617, 644 P.2d 810 (1982) (no reasonable expectation of privacy in air molecules leaking from luggage, whether or not trained dogs are used to "analyze" the molecules; dog sniff therefore does not constitute a search). Pooley is thus asking for extraterritorial application of the Alaska Constitution: Pooley's claim is that even though their actions occurred entirely in California and complied with the requirements of the California and federal constitutions, California law enforcement officers were somehow obligated to recognize and honor Pooley's personal rights under the Alaska Constitution.

In the analogous situation of searches conducted by foreign officials, Professor LaFave has concluded that "use of the exclusionary rule with respect to foreign searches is justifiable only when American authorities may fairly be held accountable for not preventing the particular conduct complained of." 1 LaFave, *supra*, § 1.6(g), at 144 (1978). California courts have accepted this analogy and taken a "choice of law" approach to applying the exclusionary rule to conduct occurring outside the state. In *People v. Blair*, 25 Cal.3d 640, 159 Cal. Rptr. 818, 602 P.2d 738, 747–48 (1979), the California Supreme Court upheld admission of the fruits of a Pennsylvania seizure which was valid under federal and Pennsylvania law, even though it would have been invalid if it had occurred in California. *Ac-*

*cord People v. Orlosky*, 40 Cal.App.3d 935, 115 Cal.Rptr. 598 (1974). The court reasoned that the exclusionary rule has a twofold purpose: to deter illegal police conduct and to relieve the courts from being compelled to participate in illegal conduct. Neither goal would be served by exclusion of the evidence in that case, according to the court, since Pennsylvania authorities would not (and indeed, should not) be deterred from engaging in conduct which is legal in their state, and admission of the evidence in a California court would not mean placing the judicial imprimatur on lawlessness. *See also* Tullis and Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule*, 10 U.S.F.L.Rev. 67, 91 (1975) ("unless the forum regards judicial integrity as a separate basis for application of the exclusionary rule, the evidence should be admitted since the search activity that occurred outside the jurisdiction of the forum was not illegal").[6]

We have found no Alaska cases addressing this point. In the absence of contrary authority, we adopt the reasoning of the California Supreme Court in *Blair* and hold that the Alaska Constitution was not implicated here, even assuming that Agent Smith's conduct would have violated the Alaska Constitution if it had occurred in Alaska or had been engaged in by an Alaskan officer.

**B. Manipulation of Pooley's Luggage**

■ Pooley also argues that when Agent Smith placed each of his suitcases on the floor and pressed them in order to feel their contents, he conducted a search of each bag within the meaning of the fourth

**6.** The precise extent of the relationship between judicial integrity and the exclusionary rule remains unsettled. *See United States v. Janis*, 428 U.S. 433, 458 n. 35, 96 S.Ct. 3021, 3034 n. 35, 49 L.Ed.2d 1046, 1063 n. 35 (1976) ("Judicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the Fourth Amendment"); *Stone v. Powell*, 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) ("While courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited

force as a justification for the exclusion of highly probative evidence). The Supreme Court has recently stated that "the question whether the use of illegally obtained evidence in judicial proceedings represents judicial participation in a Fourth Amendment violation and offends the integrity of the courts 'is essentially the same as the inquiry into whether exclusion would serve a deterrent purpose.'" *United States v. Leon*, 468 U.S. ——, —— n. 22, 104 S.Ct. 3405, 3421 n. 22, 82 L.Ed.2d 677, 697 n. 22 (1984), *quoting United States v. Janis.*

amendment. It is undisputed that the fourth amendment protects an individual's reasonable expectation of privacy in the contents of personal luggage. *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *Arkansas v. Sanders*, 442 U.S. 753, 762, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). In this case it is apparent that Smith's conduct went beyond what was necessary to conduct a dog sniff, contrary to the state's assertion.[7] Pooley cites a number of lower court cases in an effort to establish that physical manipulation will be deemed a search. Recent United States Supreme Court decisions strongly suggest, however, that the crucial area of inquiry in determining whether a search has occurred will be in the reasonableness of the privacy expectation the owner has *in the information disclosed by the search*. *See United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (use of a "beeper" to track the movements of a car through a public place disclosed nothing otherwise unobservable, and was not a search). Thus, in certain instances it may be possible for police conduct to constitute a common-law trespass to property and nevertheless not constitute a "search" under the fourth amendment. *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Illinois v. Andreas*, 463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). *See also Dye v. State*, 650 P.2d 418, 421–22 (Alaska App.1982).

 Under this analysis, it is apparent that the reasonable expectation of privacy in luggage that is in a person's actual possession or control will be different from the expectation of privacy in luggage that is checked to a commercial airline. In this case the privacy interest under considera-

tion is not, as Pooley suggests, in the contents of the luggage (as would be implicated by *opening* ), but rather, in the fact that there was a "bulge" or "dense, compressed area" in each piece of luggage. It may have been unreasonable to expect that this fact would remain unknown to those handling the soft-sided Skyway bags. Pooley focuses on the distinction between the privacy invasion that occurs when civilian baggage handlers load baggage onto an airplane and the invasion that occurs when agents of the state engage in essentially the same conduct for law enforcement purposes. This focus seems misplaced: the handling that airline employees would engage in is relevant in determining the reasonableness of Pooley's expectation of privacy in the existence of the "bulge" or "dense, compressed area."

However, we consider the question a very close one, and we are not prepared to hold, based on the record before us, that no fourth amendment violation occurred.

 But, even assuming that Smith's conduct in pressing the bags violated the fourth amendment, it does not necessarily follow that the warrant was tainted. The information gained was presented to the magistrate through the testimony of Trooper Storey. Given the strength of the other evidence presented to the magistrate, though, we are confident that the warrant would have been properly issued even if no mention had been made of the "dense, compressed area[s]." *Schmid v. State*, 615 P.2d 565, 575 (Alaska 1980).

 Nor can we say that the warrant was tainted indirectly, in the sense that the Alaska State Troopers would have acted differently if they had not known about the "bulges" or "compressed area[s]." Trooper Storey testified that his suspicions were alerted by the totality of the information

---

7. In *United States v. Viera*, 644 F.2d 509, 510–11, (5th Cir.) *cert. denied*, 454 U.S. 867, 102 S.Ct. 332, 70 L.Ed.2d 169 (1981), the officers squeezed the luggage for the purpose of forcing out air so that the drug detection dog would get a stronger scent. The court concluded that this "prepping" was not a search. In the pre-*Terry* case of

*Hernandez v. United States*, 353 F.2d 624 (9th Cir.1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966), the court held that forcing out air for the officers themselves to smell *was* a search, but that there was probable cause. We do not see these cases as controlling.

relayed by Agent Smith; it seems to us highly unlikely that the information about the compressed areas could have been so crucial to Trooper Storey that he would have allowed Pooley to leave without questioning him about the luggage had he not known this fact.[8]

### C. Police Conduct at Anchorage Airport

#### 1. The Stop of Pooley

Alaska State Troopers observed Pooley as he left the airplane, walked through the airport and into the parking lot at the Anchorage International Airport, where they stopped him. Pooley later based his motion to suppress in part on the ground that the detention was illegal. Judge Carlson concluded that "some of the factors known to the officers in Anchorage certainly are sufficient for them to effect a *Terry* -type stop of the defendant."

In *Howard v. State,* 664 P.2d 603, 608 (Alaska App.1983), this court stated:

There are essentially three types of contact between the police and private citizens which have received attention in the reported cases: (1) A generalized request for information, for example, questions put to bystanders during an on-the-scene investigation of a crime. (2) An investigatory stop, supported by articulable suspicion that a person has committed or is about to commit a crime. (3) Finally, an arrest, based upon facts and circumstances which would lead a prudent person to believe that a crime had been committed and that the person arrested had committed it.... An inquiry of someone at the scene is not necessarily a fourth amendment seizure. An investigatory stop and an arrest are fourth amendment seizures. [Citations omitted.]

In *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 238 (1983), the Supreme Court stated:

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting some questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without objective, reasonable grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed. [Citations omitted.]

*Accord Brown v. State,* 684 P.2d 874, 877 (Alaska App.1984), *petition for hearing granted* (Alaska, October 4, 1984); *Howard v. State,* 664 P.2d at 608. A person is seized when a reasonable person in his position would not feel free to leave. *Florida v. Royer,* 460 U.S. at 502, 103 S.Ct. at 1326, 75 L.Ed.2d at 239; *Waring v. State,* 670 P.2d 357, 364 (Alaska 1983); *Brown v. State,* 684 P.2d at 877. Normally, the question of when a seizure occurs is factual, and the trial court's finding of fact should be overturned only if clearly erroneous. *Waring v. State,* 670 P.2d at 364 n. 15; *Brown v. State,* 684 P.2d at 877.

**8.** In denying Pooley's motion to suppress, the superior court was not expressly asked to rule whether the investigative efforts made by Agent Smith after he manipulated the luggage to feel its contents (such as conducting a dog sniff) were the direct result of the information disclosed by the manipulation. Accordingly, there was no specific finding by the superior court on this issue. In our view, however, the record would not support a finding that Smith's decision to subject the luggage to a dog sniff would not have been made but for the information he gained in manipulating the luggage. We note that Smith had already arranged for the dog and its handler to come to the area in which Pooley's luggage was located.

Here, Judge Carlson made no finding as to precisely when Pooley was seized for fourth amendment purposes. At the suppression hearing, the following exchange occurred between defense counsel and Trooper Storey:

Q And how long did the confrontation in the parking lot last?

A A minute, maybe two minutes.

Q You don't recall that there was a much longer discussion between the officers and Mr. Pooley about what their interest was and why they were stopping him and what the problem was and that sort of thing?

A As I recall, the two officers approached him and identified themselves and asked if he had any identification, which he produced. And they asked him if he'd be willing to go back inside the terminal building so they could talk to him briefly, and it's more convenient to do it inside the terminal building so we don't cause the individual any embarrassment by doing it in the parking lot. And he said he was willing to do that, however he'd like to know why. And we explained that to him a couple of times. And we explained to him about the false name and the—the false name and address and phone number, and at that time he picked up his attache case and accompanied us back into the terminal.

Q You recall the contact with him only lasting a minute or two in the parking lot?

A It was—it was brief, it wasn't very long. My impression of it was a minute or two.

Q Could it have been as long as 10 or 15 minutes?

A Absolutely not.

Q And was Mr. Pooley free to leave from the parking area?

A In my opinion, if he'd've said no, I don't want to go back with you to the terminal, I would've let him go, yes.

 The question, of course, is not whether the troopers would have let Pooley go, but whether a reasonable person would

have felt free to go. Certainly, the evidence supports the conclusion that the initial stop was consensual. While the troopers explained that they suspected Pooley of transporting drugs and told him the basis of their suspicion, it does not appear that their behavior was conduct which " 'a reasonable person would view as threatening or offensive even if coming from another private citizen.' " *Waring v. State*, 670 P.2d at 364, *quoting* 3 W. LaFave, *Search & Seizure* § 9.2, at 53–54 (1978). The mere request for identification does not automatically render the stop a seizure, where it does not appear that the identification was retained for an unnecessarily long time. *See Brown v. State*, 684 P.2d at 877. An officer who approaches someone and asks questions may continue to ask questions if his suspicions are not allayed by the answers he receives. *See Royer*, 460 U.S. at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 238, and *G. R. v. State*, 638 P.2d 191, 195 (Alaska App.1981), *rev'd on other grounds sub nom Waring v. State*, 670 P.2d 357 (Alaska 1983). *See also United States v. Jodoin*, 672 F.2d 232, 235 (1st Cir.1982) (when answers to initial questions produce additional suspicion, they justify further questioning).

 We hold that no fourth amendment seizure occurred at least until the officers asked Pooley to return with them to the terminal. It is clear that at this point there were more than enough facts to support a reasonable suspicion that Pooley was carrying contraband. When the troopers stopped him, they knew everything that Agent Smith had told Trooper Storey in two telephone conversations, which included, along with whatever conclusions Smith was able to reach based upon his experience and his observation of Pooley, the following facts: the drug detection dog had exhibited a "weak positive alert" to one of Pooley's pieces of luggage, indicating the presence of marijuana, hashish, cocaine or heroin; the address listed on Pooley's luggage did not exist; the telephone number given to the airline had been disconnected; and Pooley remained on board during the

one-hour layover in Seattle, even though the temperature inside the aircraft made it uncomfortable and most other passengers apparently deplaned during the layover. Immediately before being stopped, Pooley was about to enter a car in the parking lot, even though he had checked three bags. Nothing in Pooley's behavior after he was stopped could have allayed the suspicions of the officers that Pooley was carrying narcotics in his luggage and, perhaps, his briefcase. When asked for identification, he produced an Alaska driver's license in a name different from that listed on his ticket and luggage. He denied having checked any luggage, and stated that he could not find his ticket. It was at this point that the troopers asked Pooley to accompany them back inside the terminal.

 In Alaska, investigatory stops are limited to situations where officers have a reasonable suspicion that imminent public danger exists or that serious harm to persons or property has recently occurred. *Coleman v. State*, 553 P.2d 40 (Alaska 1976).

Pooley argues that bringing marijuana into Alaska would not constitute "imminent public danger" within the meaning of *Coleman*. Judge Carlson concluded that it did. As the state points out, the facts known to Trooper Storey would amply support a suspicion that Pooley had transported substantial quantities of illegal drugs a long distance for commercial purposes, not just that he possessed small quantities of illegal drugs for personal use. The illegal traf-

ficking of controlled substances is a major problem in Alaska. The lucrative profits to be made from illegal drug sales have attracted an increasingly high level of criminal activity, and widespread distribution of illegal drugs poses a serious danger to the health and safety of many potential users, especially among school-age children. Most controlled substances sold illegally in Alaska are imported from outside the state, often by persons acting as drug couriers. We believe the public, as well as the police, have a vital interest in assuring that illegal drug traffic is detected and curtailed before illicit drugs are actually placed into distribution in Alaska. *Compare Hubert v. State*, 638 P.2d 677, 685–86 (Alaska App. 1981) (even though crime actually being investigated was relatively minor felony of receiving and concealing stolen property, connection of the stolen property with recent burglary, coupled with high police interest in recovering proceeds of a theft before they are placed in the chain of illegal distribution and dispersed, justifies conclusion that *Coleman* standard was met).

 In our view it would be utterly unrealistic to conclude that Pooley was reasonably suspected of being a drug courier, but that the police had no basis for suspecting that he might constitute an imminent danger to public safety.[9] Accordingly, we hold that Judge Carlson did not err in concluding that the stop was justified under *Coleman*.

9. In *Mattern v. State*, 500 P.2d 228 (Alaska 1972), the supreme court echoed the concern expressed in some quarters that *Terry* not become the vehicle for "serious and unintended erosion of the protection of the Fourth Amendment." *Id.* at 233 n. 15, *quoting Adams v. Williams*, 407 U.S. 143, 153, 92 S.Ct. 1921, 1927, 32 L.Ed.2d 612, 621 (1972) (Brennan, J., dissenting). In *Coleman*, the supreme court again recognized the validity of this concern. *Coleman v. State*, 553 P.2d 40, 45 n. 17 (Alaska 1976). The line drawn by the *Coleman* court between, on the one hand, offenses involving serious danger or recent serious harm, and, on the other, less serious offenses, speaks directly to this concern. The *Coleman* line can be discerned in other areas. A situation in which police have a rea-

sonable suspicion that a person is transporting illegal drugs for eventual distribution in the state is clearly distinguishable from a situation in which police suspect that an individual is in possession of a small quantity of an illegal drug or have no reason to believe that distribution is contemplated. The latter situation raises the spectre of routine stop-and-frisk procedures. *See Adams v. Williams*, 407 U.S. 143, 151–52, 92 S.Ct. 1921, 1926, 32 L.Ed.2d 612, 620 (1972) (Douglas, J., dissenting, and Brennan, J., dissenting) (agreeing with lower court dissent by Judge Friendly, because if *Terry* is extended to crimes such as possession of narcotics, "There is too much danger that, instead of the stop being the object and the protective frisk an incident thereto, the reverse will be true").

## 2. Scope of the Detention

We have concluded that the detention of Pooley was justified. The question next arises whether the detention exceeded the permissible scope of a *Terry*-type stop.

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238. In *Royer*, five justices agreed that the nature of the detention of the suspect was such that it had matured into a full-blown arrest, for all practical purposes, by the time the suspect consented to a search of his baggage:

By the time Royer was informed that the officers wished to examine his luggage, he had identified himself when approached by the officers and had attempted to explain the discrepancy between the name shown on his identification and the name under which he had purchased his ticket and identified his luggage. The officers were not satisfied, for they informed him they were narcotics agents and had reason to believe that he was carrying illegal drugs. They requested him to accompany them to the police room. Royer went with them. He found himself in a small room—a large closet—equipped with a desk and two chairs. He was alone with two police officers who again told him that they thought he was carrying narcotics. He also found that the officers, without his consent, had retrieved his checked luggage from the airlines. What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated, and we cannot fault the Florida District Court of Appeal for concluding that *Terry v. Ohio* and the cases following it did not justify the restraint to which Royer was then subjected.

*Id.* at 502–503, 103 S.Ct. at 1327–28, 75 L.Ed.2d at 239–40. The plurality distinguished the Court's decision in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), on the grounds that in *Mendenhall* "no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched." *Royer*, 460 U.S. at 503 n. 9, 103 S.Ct. at 1327 n. 9, 75 L.Ed.2d at 240 n. 9. The court also pointed out that the officers' conduct in dealing with Royer was more intrusive than necessary, because they could have returned his ticket and identification and told him he was free to go, there were no facts establishing "that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer [from the concourse] to the police room prior to the officer's attempt to gain his consent to a search of his luggage," and it may well have been feasible to investigate the contents of Royer's bags in a more expeditious way—by means of a dog sniff. *Id.* at ——, 103 S.Ct. at 1328, 75 L.Ed.2d at 241–42. If a dog sniff had been conducted, according to the plurality,

Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short

order; a positive result would have resulted in his justifiable arrest on probable cause.

*Id.* at 506, 103 S.Ct. at 1329, 75 L.Ed.2d at 242.[10]

In *Howard v. State,* we noted that the line between an investigatory stop and a full arrest is less clear than the line between consensual contact and an investigatory stop. We quoted the following language from *Royer:*

We do not suggest that there is a litmus paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answer to the question whether there has been an unreasonable search and seizure in violation of the Fourth Amendment.

664 P.2d at 608, *quoting Florida v. Royer,* 460 U.S. 506, 103 S.Ct. at 1329, 75 L.Ed.2d at 242. We went on to state:

Recognizing the uncertainties that still exist in the law regarding distinguishing between lawful stops and custodial arrest, we believe the following factors serve to distinguish them.

First, the court must consider the purpose for the stop and, specifically, the kind of criminal activity being investigated.... Second, the stop must be for a limited and specific inquiry, *i.e.,* the police must be diligently pursuing a means of investigation which is soon likely to resolve the matter one way or the other. Once the inquiry is completed the person detained must be freed or arrested.... Third, the stop must be of brief duration; the exact length will depend in part upon what is learned by the police relating to

their initial suspicions. As one court pointed out:

The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

*State v. Watson,* 165 Conn. 577, 345 A.2d 532, 537 (1973). Fourth, the stop must not require the person stopped to travel an appreciable distance. Fifth, the force used in effectuating the stop must be proportional to the risk reasonably foreseen by the officer at the time he makes the stop.

664 P.2d at 609–10 (citations omitted).

 Applying these standards to the facts at hand, it appears the troopers took a course of action that was reasonable under all the circumstances. Although it does not appear the troopers explicitly told Pooley he was free to go when they asked Pooley to accompany them, they did not retain his identification, and he had not yet given them his ticket. The significance of Royer's ticket, in any event, was that Royer needed it to get on his flight, whereas Pooley had arrived at his destination. While the "concourse" at LaGuardia Airport may have been adequate for the detention of Royer in the plurality's view, we doubt that the parking lot at Anchorage International would be deemed appropriate for further questioning of Pooley, especially since the officers had the means to obtain Pooley's luggage and subject it to a dog sniff immediately, as they did. Inside the first-aid room in the terminal, Pooley added to the suspicions of the officers by attempting to hide his luggage claim checks in a chair. It was at this point that

**10.** Justice Brennan took issue with the plurality's focus on alternative courses of conduct, noting in particular that use of a trained narcotics dog might not be less intrusive than questioning Royer and asking for his consent. 460 U.S. at 511, 103 S.Ct. at 1330, 75 L.Ed.2d at 245 (Brennan, J., concurring).

he was given his *Miranda* rights and asked to consent to a search of his luggage. Pooley refused to allow the search, but within twenty minutes the bags were retrieved and exposed to the narcotic detection dog, who alerted to all three bags. *Cf. United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (bags transported to another airport and kept for ninety minutes); *United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir.1984) (bag kept for 140 minutes while narcotics detection dog was brought in and suspect apparently left on his flight as scheduled); *United States v. West*, 731 F.2d 90 (1st Cir.) *cert. denied*, — U.S. —, 105 S.Ct. 956, 85 L.Ed.2d 963 (1984) (police were diligently pursuing their investigation even though they failed to summon a dog immediately upon defendant's arrival at airport and dog arrived twenty to thirty-five minutes after being summoned).

 Pooley argues, however, that he was under *de facto* arrest immediately after being given his *Miranda* rights. Trooper Storey was asked what would have happened had Pooley walked away from the police in the parking lot, retrieved his bags, and attempted to leave. He answered that "if we have reason to believe there may be a controlled substance in the luggage, we normally advise them that they're free to go, and we'll be holding onto their luggage pending a canine search." The following exchange also occurred:

Q And I assume that once Mr. Pooley was Mirandized he was not free to leave at that point in time? Is that correct?

A We had some mixed feelings about that within our office so we contacted the District Attorney's office and asked for an opinion on it.

Q Well, the net result was that Mr. Pooley was not free to leave, though, correct?

A That's correct, yes.

Q And he certainly wasn't free to take the bags with him?

A That's correct.

We are uncertain whether the detention of Pooley ripened into a full-blown arrest at the time he was given his *Miranda* warnings. If Pooley was under arrest, police needed probable cause for arrest. Even if Pooley is correct that he was under arrest at this point and that troopers did not have probable cause, however, it does not follow that the court erred in refusing to suppress the results of the warrant. No new information was gained from Pooley after he was given his *Miranda* warnings. Even if Pooley had been told he was free to leave, and had in fact departed at that point, continued detention of his suitcases for a brief period by the troopers, so that a dog sniff could be performed, would have been justified.[11] *See United States v. Place*, 462 U.S. at 706, 103 S.Ct. at 2644, 77 L.Ed.2d at 120, where the Court stated:

In sum, we conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.

Even if Pooley was illegally arrested, the warrant was not tainted by the illegal arrest.

### 3. Dog Sniff in Anchorage

 We have concluded that the troopers had a reasonable suspicion that Pooley was carrying contraband. We hold also that this suspicion justified the limited seizure of Pooley's suitcases for the purpose of exposing them to the drug detection dog. Pooley argues that his privacy rights were separately violated by the use of the

---

**11.** Significantly, Pooley had been on the verge of leaving the airport without his luggage when initially stopped. He subsequently denied having luggage and attempted to hide his baggage claim tags. Under the circumstances the record simply does not justify a finding that the troopers' access to Pooley's luggage and their ability to subject it to a dog sniff was in any way enhanced by Pooley's continued detention.

dog. As indicated earlier, the Alaska Constitution may afford more protection in this area than the United States Constitution, as interpreted in *Place* and *Jacobsen*. Even assuming that more protection is afforded in Alaska, however, this does not compel the conclusion that a sniff of luggage is a "search" in the traditional sense. As Justice Blackmun wrote in *Place*, "a dog sniff may be a search, but a minimally intrusive one that could be justified in this situation under *Terry* upon mere reasonable suspicion." 462 U.S. at 723, 103 S.Ct. at 2653, 77 L.Ed.2d at 132 (Blackmun, J., concurring).

This is the approach taken by the Ninth Circuit Court of Appeals before *Place*. *United States v. Beale*, 674 F.2d 1327 (9th Cir.1982) (remanded for further consideration in light of *Place*, 463 U.S. 1202, 103 S.Ct. 3529, 77 L.Ed.2d 1382 (1983)).[12] As Professor LaFave has noted, "[s]everal other cases, although appearing to uphold the practice upon some broader basis, are consistent upon their facts, for they indicate that the approved surveillance was actually undertaken upon a reasonable suspicion." 1 LaFave, *supra* § 2.2, at 288 (1978). *See United States v. McCranie*, 703 F.2d 1213, 1218 (10th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); *United States v. Waltzer*, 682 F.2d 370, 372–73 (2d Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). *See also State v. Snitkin*, 681 P.2d 980, 983 (Hawaii 1984), where the court held that a sniff was not a search, but stated:

> Nevertheless, we do not consider the fourth amendment and article 1, § 7 [of the Hawaii Constitution] to be irrelevant to the police actions reviewed here.... We now hold that the reasonableness of the dog's use in the particular circumstances should be determined by balancing the state's interest in using the

dog against the individual's interest in freedom from unreasonable government intrusions.

■ The only other logical approach would be to hold that a sniff is a search requiring a full showing of probable cause; this approach has been rejected by every court that has considered the question. We hold that exposure of luggage to a drug detection dog is a search under the Alaska Constitution, but that is a minimally intrusive type of search, akin to an investigative stop and frisk under *Terry*, which may be used when police have a reasonable suspicion that drugs may be present in the container and that the drugs are being illegally imported to the state or are being illegally possessed for distribution. It follows that Pooley's rights under the Alaska Constitution were not violated when the luggage was exposed to the dog at the Anchorage airport.

We hold that the warrant was not tainted either directly or indirectly by any illegality.[13] There was no error in refusing to suppress the evidence seized pursuant to the warrant. AFFIRMED.

---

**12.** The Ninth Circuit Court of Appeals ultimately affirmed Beale's conviction, after rehearing *en banc*. *United States v. Beale*, 736 F.2d 1289 (9th Cir.), *cert. denied,* —— U.S. —— 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

**13.** We therefore do not reach the state's arguments that the seizure and ultimate search of

Pooley's bags should be upheld under the doctrines of abandonment or "inevitable discovery," or the so-called "good faith" exception to the warrant requirement announced in *United States v. Leon*, 468 U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).