[J-40-2019] [MO: Baer, J.]
**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 55 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of Superior |
| | : | Court at No. 1786 EDA 2017 dated |
| | : | March 6, 2018 Affirming the |
| v. | : | Judgment of Sentence of the |
| | : | Monroe County Court of Common |
| | : | Pleas, Criminal Division, at No. CP- |
| STACY BRITTON, | : | 45-CR-0002192-2015 dated |
| | : | January 6, 2017. |
| Appellant | : | |
| | : | ARGUED: November 19, 2019 |

**CONCURRING OPINION**

**JUSTICE WECHT**                                        **DECIDED: April 22, 2020**

Our Commonwealth's Constitution proudly proclaims:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8. "[T]he survival of the language now employed in Article I, section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth." *Commonwealth v. Sell*, 470 A.2d 457, 467 (Pa. 1983); *see also* PA. CONST. of 1776, Declaration of Rights, § 10.

The Majority answers the narrow question of whether California law enforcement officers acted as agents of Pennsylvania police officers, but concludes that "examination of whether any Pennsylvania specific constitutional or statutory protections extended to

[Stacy Britton's] situation is unwarranted." Maj. Op. at 1-2. In doing so, however, the Majority effectively undermines the freedom of privacy protected by Article I, Section 8 and implicitly revives a doctrine that the Supreme Court of the United States extinguished sixty years ago. I ultimately concur with the Majority's affirmance of the Superior Court's decision because I believe that the trial court's erroneous decision not to suppress certain surreptitious recordings made by California detectives was harmless. But rather than adopt the Majority's agency analysis, I would find that the protections of the Pennsylvania Constitution apply to Pennsylvania prosecutions in Pennsylvania courts.

## I. The Federal Silver Platter Doctrine

Although the United States Supreme Court hinted at the existence of an exclusionary remedy for violations of the Fourth Amendment as early as the nineteenth century, *see Boyd v. United States*, 116 U.S. 616 (1886), the High Court definitively adopted the exclusionary rule in *Weeks v. United States*, 232 U.S. 383 (1914):

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.

*Id.* at 393. Thus, in all *federal* criminal prosecutions, *federal* courts were to exclude evidence that the government obtained in violation of the Fourth Amendment. However, the Supreme Court had not yet applied the protections of the Fourth Amendment to the states via the Due Process Clause of the Fourteenth Amendment. *Id.* at 398 ("[T]he 4th Amendment is not directed to individual misconduct of [state] officials. Its limitations reach the Federal government and its agencies."), *overruled by Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949).

In refusing to subject state courts to the constraints of the Fourth Amendment, the Supreme Court created what came to be known as the "silver platter" doctrine. In *Weeks*,

some of the evidence presented by the prosecution in federal court was obtained by state law enforcement officials. And while the Court suppressed evidence that federal authorities acquired in violation of the Fourth Amendment, the Court wrote that "[a]s to the papers and property seized by the [state] policemen [*sic*], it does not appear that they acted under any claim of Federal authority such as would make the amendment applicable to such unauthorized seizures." *Weeks*, 232 U.S. at 398. Thus, in future federal prosecutions, state law enforcement could obtain evidence in violation of the Fourth Amendment and present that evidence to federal officials on a "silver platter" to use in federal court.

With Prohibition coming into effect, local and federal authorities increasingly had concurrent jurisdiction over particular crimes. *See* Wayne A. Logan, *Dirty Silver Platters: The Enduring Challenge of Intergovernmental Investigative Illegality*, 99 Iowa L. Rev. 293, 299-300 (2013). Federal law enforcement officers figured out that they could easily bypass the exclusionary rule by relying upon local police investigating the same crimes. *See id.* at 300 (quoting Thomas Dewey as stating that "as a Federal prosecutor we had to rely on the evidence procured by the unhampered police of the State of New York").

Realizing that it had a problem on its hands, the Supreme Court attempted to lay down a rule to adjudicate what level of involvement by federal authorities necessitated application of the Fourth Amendment in a federal prosecution. In a way, the Court created a form of agency analysis, though not one based upon traditional agency law. In *Byars v. United States*, 273 U.S. 28 (1927), the Court found that "mere participation in a state search of one who is a federal officer does not render it a federal undertaking." *Id.* at 32. However, the Court instructed trial courts to "be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." *Id.*; *see also id.* at 33-34 (warning that violations of the Fourth

Amendment should not be "impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right"). *Byars* itself involved a federal agent who "participate[d] as a federal enforcement officer" in a state investigation. *Id.* at 32. The Court concluded that this rendered the search "in substance and effect . . . a joint operation of the local and federal officers," and, thus, suppression was warranted. *Id.* at 33.

The next term, the Supreme Court went even further. In *Gambino v. United States*, 275 U.S. 310 (1927), only state law enforcement officials were present "at the time of the arrest and search." *Id.* at 316. But the Court found that evidence from that search must be suppressed because "[t]he wrongful arrest, search, and seizure were made solely on behalf of the United States." *Id.* This ruling came despite the fact that the state "troopers were not shown to have acted under the directions of the federal officials in making the arrest and seizure." *Id.* It was enough that a federal prosecution took place, effectively "ratif[ying] . . . the arrest, search, and seizure made by the [state] troopers on behalf of the United States." *Id.* 317. The Court was sure to distinguish *Gambino* from other cases in which evidence obtained by state law enforcement officials was not suppressed because *Gambino*, again, involved a seizure "made solely for the purpose of aiding the United States in the enforcement of its laws." *Id.*[1]

In 1949, the Supreme Court applied the protections of the Fourth Amendment to state prosecutions in *Wolf*, but did not incorporate the corresponding exclusionary rule.

---

[1] Notably, the Supreme Court also made this ruling even though "[t]he record . . . d[id] not show that the relation between the state troopers and the federal agencies for prohibition enforcement was called by counsel to the attention of the court." *Gambino*, 275 U.S. at 319. The Court nonetheless suppressed the evidence because "the conviction . . . rest[ed] wholly upon evidence obtained by invasion of [the defendants'] constitutional rights." *Id.*

*Wolf*, 338 U.S. at 27-28, 33.  In an opinion handed down the same day, the Court punted on the question of whether the silver platter doctrine should be overturned and instead applied *Byars* and its progeny.  *See Lustig v. United States*, 338 U.S. 74, 79 (1949) (plurality) ("Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers.").

In *Lustig*, a plurality of the Court found that a federal law enforcement officer's participation in a state investigation was sufficient to invoke suppression in federal court. Although the federal officer did not participate in the investigation from the beginning or perform the actual search, the Court found that "[t]o differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too find a line in the application of the prohibition of the Fourth Amendment." *Id.* at 78 (plurality).  "The crux of [the *Byars*] doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter." *Id.* at 78-79 (plurality); *see also id.* at 79 (plurality) ("The fact that state officers preceded [the federal officer] in breach of the rights of privacy does not negative the legal significance of this collaboration in the illegal enterprise before it had run its course.").

Even with these attempts to clarify when the level of cooperation was sufficient to invoke the protections of the Fourth Amendment, the doctrine was a mess.  One commentator has described *Byars* as "rais[ing] more questions than it answered." James W. Diehm, *New Federalism and Constitutional Criminal Procedure: Are We Repeating the Mistakes of the Past?*, 55 MD. L. REV. 223, 227 (1996).  "Not surprisingly, subsequent decisions were confusing and, in many cases, contradictory." *Id.*  After *Wolf*, the writing was on the wall.  The disjunction between incorporation of the Fourth Amendment and

the silver platter doctrine could not last.  *See Hanna v. United States*, 260 F.2d 723, 726 (D.C. Cir. 1958).

In 1960, the Supreme Court stepped in and overturned the silver platter doctrine. The Court found that the doctrine had "engender[ed] practical difficulties," and "difficult and unpredictable . . . application[s] to concrete cases."  *Elkins v. United States*, 364 U.S. 206, 211, 212 (1960).  With regard to the "recurring question" of determining the level of federal involvement, lower "federal courts did not find themselves in complete harmony, nor even internally self-consistent."  *Id.* at 212.  Given these difficulties, the Court invoked its "supervisory power over the administration of criminal justice in federal courts," *id.* at 216, and found that "[t]o the victim" of the Fourth Amendment violation "it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." *Id.* at 215.  A violation was a violation, and federal courts could not permit the introduction of evidence in violation of the Fourth Amendment, no matter its source.

Finally, the Supreme Court made this ruling even as it was in the midst of shifting its rationale for the underlying exclusionary rule.  Originally, the exclusionary rule was conceived as an integral part of the Fourth Amendment itself.  *See Silverthorne Lumber Co., Inc. v. United States*, 251 U.S. 385, 392 (1920) (Holmes, J.) (finding that attempts to use information gleaned from an illegal search "reduces the Fourth Amendment to a form of words"); *see also* Tom Quigley, Comment, *Do Silver Platters Have a Place in State-Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions*, 20 ARIZ. ST. L.J. 285, 296 (1988) ("Clearly, the *Silverthorne* Court based exclusion solely on the [F]ourth [A]mendment.").

But things began to change in *Wolf*, where the Supreme Court called the rule "an effective way of deterring unreasonable searches," *Wolf*, 338 U.S. at 31, importing a new reason for the exclusionary rule.  *See also* Gerald H. Galler, *The Exclusion of Illegal State*

*Evidence in Federal Courts*, 49 J. CRIM. L. CRIMINOLOGY & POLICE SCI. 455, 457 n.8 (1958-59) ("Until the *Wolf* case the federal exclusion rule was treated in the federal courts as being an integral part of the [F]ourth [A]mendment and not a rule of evidence enacted to enforce it."). Similarly, in *Elkins*, the Court wrote that "[t]he rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins*, 364 U.S. at 217. And the High Court's seminal decision in *Mapp v. Ohio*, 367 U.S. 643 (1961), applying the exclusionary rule to state prosecutions, recognized the same. *Id.* at 656; *but see id.* at 650 (calling the exclusionary rule "part and parcel of the Fourth Amendment's limitations upon federal encroachment of individual privacy"); *Elkins*, 364 U.S. at 222 (writing that "another consideration" was "the imperative of judicial integrity").[2]

Thus, even as the Supreme Court began to adopt a deterrence (rather than privacy) rationale for the exclusionary rule, it still found that a bright-line decree—forbidding all evidence obtained in violation of the Fourth Amendment, no matter the sovereign identity of the law enforcement officer—was the appropriate way to enforce the Fourth Amendment's protections in federal prosecutions. The federal silver platter doctrine was dead, and the High Court has never revived it.

---

[2] As we now know, the United States Supreme Court would later abandon completely all other reasons for the exclusionary rule and solely rely upon deterrence of police misconduct. *United States v. Calandra*, 414 U.S. 338, 348 (1974) ("In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."); *id.* at 356 (Brennan, J., dissenting) ("This downgrading of the exclusionary rule to a determination whether its application in a particular type of proceeding furthers deterrence of future police misconduct reflects a startling misconception, unless it is a purposeful rejection, of the historical objective and purpose of the rule.").

## II. State Silver Platter Doctrines

When the Supreme Court decided *Elkins* and *Mapp*, the federal judiciary was at the forefront of defining the privacy rights guaranteed by our founding charters. *See* Julius Berman & Paul Oberst, *Admissibility of Evidence Obtained by an Unconstitutional Search and Seizure—Federal Problems*, 55 Nw. U. L. Rev. 525, 532 (1960-61) (noting that, at the time the article was written, twenty-five states had not adopted the exclusionary rule). Pennsylvania, regrettably, was not among those states that adopted an exclusionary rule before *Mapp*. *See Commonwealth v. Chaitt*, 112 A.2d 379, 381-82 (Pa. 1955).

But soon state courts began to take the lead. As Justice Brennan noted in 1977, "more and more state courts are construing state constitutional counterparts of provisions of the Bill of Rights as guaranteeing citizens of their states even more protection than the federal provisions, even those identically phrased." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 495 (1977); *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 91 (1980) (Marshall, J., concurring) (calling this development "a very healthy trend of affording state constitutional provisions a more expansive interpretation than [the Supreme] Court has given to the Federal Constitution"). This "New Federalism" trend applied equally to state constitutional provisions pertaining to searches and seizures. *See* Mary Jane Morrison, *Choice of Law for Unlawful Searches*, 41 Okla. L. Rev. 579, 594-96 (1988).

As state courts interpreted their state constitutions to provide greater protections than the Fourth Amendment, two new silver platter problems arose in state courts: (1) the "reverse silver platter" (evidence obtained by federal authorities, possibly in compliance with the Fourth Amendment, but in a way that violated the state's constitution); and (2) the "interstate silver platter" (evidence obtained by a sister state's authorities in a way that violated either the forum state's constitution, the sister state's constitution, or both). By

the mid-1970s, the need to address both the reverse and interstate silver platter problems was growing.[3]  In 1975, "[t]he view expressed in *Lustig* was also reflected in decisions by state courts concerned with the 'interstate silver platter.'"  Richard Tullis & Linda Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule*, 10 U.S.F. L. REV. 67, 68 (1975).  Since then-California Deputy Attorneys General Tullis and Ludlow wrote their influential article in 1975, *see, e.g.*, *State v. Lucas*, 372 N.W.2d 731, 736-37 (Minn. 1985) (citing the article); *Pooley v. State*, 705 P.2d 1293, 1303 (Alaska Ct. App. 1985) (same); *see also* Britton's Brief at 27-28 (citing *Lucas* and the article), state courts generally have taken one of two approaches to adjudicate reverse and interstate silver platter issues.  First, some states employ a choice (or conflict) of law approach.  Second, other states use an "exclusionary rule analysis."

### A. Choice of Law Approach

Under a choice of law analysis, "courts analyze the issue as if it were a civil case and apply the choice of law method of the forum state to determine whether the law of the forum state or the situs state should be followed, and what sanctions are to be used if the appropriate law is violated." *People v. Porter*, 742 P.2d 922, 925 (Colo. 1987).[4]  The first question a court would ask is whether the rule pertains to procedure or substance,

---

[3]   At the time of *Mapp*, only six states with judicially-adopted exclusionary rules had considered the reverse silver platter, with five of those states excluding evidence obtained by federal officers.  *See* Berman & Oberst, *supra* at 548.  With regard to the interstate silver platter, five states had considered that doctrine, with mixed holdings on admitting the evidence.  *See id.* at 549; Galler, *supra* at 459 n.23

[4]   The "forum state" refers to the state of the prosecution (in this case, Pennsylvania), while the "situs state" refers to the state of the search (in this case, California).  In reverse silver platters, "situs" could also refer to the jurisdiction of the federal government, even though the search is taking place within the physical boundaries of the forum state.

as the trial court did in this instance. *See* Trial Court Opinion, 10/27/2016, at 4-5 ("Trial Ct. Op.").

In *Burge v. State*, 443 S.W.2d 720 (Tex. Crim. App. 1969), the Texas Court of Criminal Appeals, the high court in that state for all criminal matters, concluded that determination of how to apply the exclusionary rule in an interstate silver platter case was a procedural, rather than a substantive, question. *Id.* at 723. With little analysis, the court simply stated that "in such instances the law of the forum (Texas in this case) governs as to procedure and rules of evidence," citing three treatises. *Id.* The court found that "[a]ny other view would lead to endless perplexity." *Id.*

Courts that have selected other choice of law approaches, *see, e.g.*, *People v. Saiken*, 275 N.E.2d 381, 383-85 (Ill. 1971), and exclusionary rule approaches, *see, e.g.*, *Lucas*, 372 N.W.2d at 736-37, have rejected the idea that application of the exclusionary rule is a procedural choice of law matter. And the *Burge* approach has been much criticized in scholarly commentary. *See, e.g.*, Wayne R. LaFave, 1 Search & Seizure § 1.5(c) (5th ed. 2019) ("The summary disposition in *Burge* on the ground that the law of the forum controls on matters of procedure has been justly criticized for its imprecision."); Morrison, *supra* at 581 ("Although the exclusionary rule in criminal procedure governs the admissibility of evidence, it is neither a rule of procedure nor a rule of evidence for choice-of-law purposes."); Tullis & Ludlow, *supra* at 85 ("The approach taken by the *Burge* court was criticized by one commentator as a 'mechanical application of the substance-procedure choice of law.'") (quoting Note, *Conflict of Laws—Criminal Procedure—Law of Forum Applies to Search and Seizure in Accused's Out-of-State Residence*, 23 Vand. L. Rev. 425 (1970)).

While application of the exclusionary rule fits into the broad category of law called "criminal *procedure*," it is not procedural in the same way that rules of criminal or civil

procedure are.  "Given this Court's recognition that the exclusionary rule is essential to protect the individual rights enumerated in our own Pennsylvania Constitution," *Commonwealth v. Bishop*, 217 A.3d 833, 853 (Pa. 2019) (Wecht, J., dissenting), and not essential to protect the individual rights enumerated in our Rules of Criminal Procedure, the designation of the exclusionary rule as merely a rule of procedure is unsatisfactory, as the trial court correctly found, *see* Trial Ct. Op. at 5 ("This issue is a constitutional law question involving the fundamental right to be free from unreasonable searches and seizures.").

Other courts, however, have chosen to do a substantive choice of law analysis, whereby a court "adopt[s] one of the multifactor conflict-of-laws approaches that have arisen in the last century (or . . . create[s] a unique multifactor approach that draws on the factors used in more than one of the recently developed approaches)," such as those embodied in the Restatement (First) Conflict of Laws or Restatement (Second) Conflict of Laws.  Megan McGlynn, Note, *Competing Exclusionary Rules in Multistate Investigations: Resolving Conflicts of State Search-and-Seizure Law*, 127 YALE L.J. 406, 435 (2017).

For example, the Illinois Supreme Court had to decide whether to apply the Illinois or Indiana exclusionary rules for a prosecution in Illinois court of a crime committed in Illinois, but where the search took place in Indiana and violated Indiana law.  *Saiken*, 275 N.E.2d at 383-84.  That court used a "significant relationship" or "center of gravity" test and considered a number of factors:

> The crime was committed in Illinois; it was being prosecuted there; the defendant was a resident and citizen of Illinois; the great majority of the witnesses, who would testify at the trial, were Illinois residents; Indiana had no vital contact with the crime; and the application of Illinois evidentiary law would not offend the comity of interstate relationships between Indiana and Illinois.

*Id.* at 385. Based upon those factors, the court concluded that the Illinois exclusionary rule should apply. *Id.* at 386. Similarly, the Rhode Island Supreme Court used a five-factor test to determine whether the Rhode Island Constitution and its exclusionary rule should apply to statements given to the New Hampshire police. *State v. Briggs*, 756 A.2d 731, 739-40 (R.I. 2000).

But there are significant criticisms of the substantive choice of law approach as well. A multi-factor balancing test, drawn from civil choice of law treatises, does not give serious consideration to the exclusionary rule, which is at the heart of the Pennsylvania Constitution's protection against unreasonable searches and seizures. *See* McGlynn, *supra* at 437 (writing that the civil choice of law factors "give too little weight to the purposes of the exclusionary rule and too much weight to factors irrelevant to the administration of the criminal justice system"); Tullis & Ludlow, *supra* at 88 ("Many of the factors which are of significance in civil law are of little or no importance to a determination of whether evidence should be excluded because of a violation of a state rule."). And such a test is both indeterminate and susceptible to reverse engineering.

Additionally, the same criticism of treating the exclusionary rule as procedural applies to a substantive choice of law analysis. Just as our Rules of Criminal Procedure are promulgated by this Court, pursuant to authority granted by our Constitution, *see* PA. CONST. art. V, § 10, determination of which factors to choose in a choice of law analysis is within the purview of this Court, *see Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 800-01 (Pa. 1964). In that sense, the Rules of Criminal Procedure and choice of law analyses are subordinate to this Court. A constitution, in contrast, is "a superior, paramount law, unchangeable by ordinary means." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This Court is subordinate to this Commonwealth's Constitution and all that it dictates, including the exclusionary rule. To allow a choice of law analysis to control how

and when we apply our exclusionary rule would be to elevate this Court above our Constitution, a result that goes against the very nature of our form of government.

## B. Exclusionary Rule Approach

In contrast to a choice of law approach, "[u]nder an exclusionary rule analysis the court first identifies the principles to be served by the exclusionary rule, and then evaluates how the principles would be served by exclusion" if the forum or situs state's law were to apply. Quigley, *supra* at 322. In other words, the court looks first at its own state constitutional provision protecting against unreasonable searches and seizures. The court then identifies the rationale for the exclusionary rule, such as deterrence or the protection of privacy rights. Finally, the court determines whether the rationale for the exclusionary rule would be served by excluding the evidence obtained in the foreign jurisdiction.

Numerous courts across the country have adopted such an approach, either explicitly or implicitly. *See, e.g.*, *State v. Torres*, 262 P.3d 1006 (Haw. 2011); *Commonwealth v. Brown*, 925 N.E.2d 845 (Mass. 2010); *State v. Cardenas-Alvarez*, 25 P.3d 225 (N.M. 2001); *State v Davis*, 834 P.2d 1008 (Or. 1992); *State v. Mollica*, 554 A.2d 1315 (N.J. 1989); *Porter*, 742 P.2d 922; *Echols v. State*, 484 So.2d 568 (Fla. 1985); *Lucas*, 372 N.W.2d 731; *People v. Blair*, 602 P.2d 738 (Cal. 1979); *Pooley*, 705 P.2d 1293;[5] *see also* McGlynn*, supra* at 442 (writing that this approach "enjoys the most widespread judicial and scholarly support"); Dana Perkins, *Declining to Adopt an Agency Analysis in the Admissibility of Evidence Obtained in Another Jurisdiction Promotes Circumvention of the Connecticut Constitution.* State v. Boyd, *992 A.2d 1071 (Conn.*

---

[5] Even some states that have adopted a conflict of laws analysis have also used an exclusionary rule analysis at some points. *Compare Saiken*, 275 N.E.2d 381, *with People v. Coleman*, 882 N.E.2d 1025 (Ill. 2008).

*2010)*, 42 RUTGERS L.J. 1041, 1047 (2011) ("[M]ost [courts] agree that using an exclusionary rule analysis is preferable.").

As noted above, an exclusionary rule analysis recognizes the Constitution in its proper place, as the supreme law of the land. A state's constitution takes priority over all other forms of law in a state, whether statutory, common law, or rules of procedure. By first examining the purpose of a state constitution's exclusionary rule, a court properly subordinates its adjudication of a particular criminal case to that constitution. Accordingly, our Commonwealth should employ an exclusionary rule analysis to determine whether to resolve a suppression motion by applying Pennsylvania law or the law of a foreign sovereign.

There is Pennsylvania precedent to suggest that our courts have used a choice of law approach in the past. For example, in *Commonwealth v. Housman*, 986 A.2d 822 (Pa. 2009), this Court's approach emphasized "the policy of the jurisdiction most intimately concerned with the outcome" to find that a tape recording that complied with Virginia law, but violated Pennsylvania law, should not be suppressed. *Id.* at 842 (internal quotation marks omitted). *Housman*, in turn, relied upon *Commonwealth v. Sanchez*, 716 A.2d 1221 (Pa. 1998). The *Sanchez* Court used a civil choice of law analysis, which the Court found also should apply in the criminal context, and decided that California had a greater interest in a canine sniff that took place in California; thus, California law should govern suppression. *Id.* at 1223-24. Finally, *Sanchez* cited the Superior Court's opinion in *Commonwealth v. Bennett*, 369 A.2d 493 (Pa. Super. 1976) (*en banc*). In *Bennett*, the court found that applying a Pennsylvania wiretap statute, which had greater protections than a New Jersey statute, was unwarranted because a Pennsylvania court "would not chastise errant law enforcement agencies or officers" in New Jersey. *Id.* at 495.

However, *Bennett* did not actually use a choice of law analysis. Rather, *Bennett* implicitly used an exclusionary rule analysis, albeit one based upon a statute, rather than the Constitution. In 1976, when the Superior Court decided *Bennett*, this Court had not yet issued an opinion stating that our exclusionary rule was based upon privacy rights, rather than deterrence. *See Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991). When the *Bennett* Court reasoned that applying the Pennsylvania wiretap statute would not deter New Jersey law enforcement officers from violating Pennsylvania law, that court implicitly used an exclusionary rule analysis by finding that the purpose of the wiretap statute, as determined by the General Assembly, was to deter police misconduct, rather than to protect privacy rights. Judge Hoffman's dissent in *Bennett* also used an exclusionary rule analysis, though he argued that the statute intended to protect privacy rights. *Bennett*, 369 A.2d at 501 (Hoffman, J., dissenting) (opining that the evidence should be suppressed under the Pennsylvania statute because "[t]he history [of the statute] indicate[d] that the Legislature did not seek primarily to deter the police, but rather intended to protect Pennsylvania citizens' privacy from any electronic inclusion"). The Washington Supreme Court also interpreted *Bennett* as applying an exclusionary rule analysis. *See Washington v. Brown*, 940 P.2d 546, 579 n.159 (Wash. 1997) (applying an exclusionary rule analysis with a deterrence rationale and citing *Bennett*).

To the extent that this Court in *Housman* relied upon *Sanchez*, and *Sanchez* relied upon *Bennett*, to employ a choice of law analysis, we mischaracterized *Bennett*. And it does not appear that this Court, at least in *Housman*, had the benefit of advocacy debating whether a choice of law or exclusionary rule analysis was more appropriate. *Compare* Housman's Brief, 452 CAP, at 78 (citing *Sanchez*), *and* Commonwealth's Brief, 452 CAP, at 74, 77-78 (citing *Sanchez* and *Bennett*), *with* Britton's Brief at 27-36 (discussing the two approaches and arguing that the exclusionary rule analysis should govern), *and*

Commonwealth's Brief at 10-13 (citing *Bennett* for the proposition that California law should determine suppression under a choice of law approach); *see also* Maj. Op. at 10 ("[T]he Commonwealth primarily contends that a conflict-of-law analysis, like that performed by the trial court, applies to and permits the secret recording of the statements that [Britton] made in her California home."). Unlike in *Housman*, these arguments are now squarely presented. Britton's arguments regarding use of an exclusionary rule analysis are compelling, and I would find that the exclusionary rule governs cases such as this.

### III. Employing an Exclusionary Rule Analysis

Because a state court is not required to interpret its state constitution in conformity with the Fourth Amendment, *see Commonwealth v. DeJohn*, 403 A.2d 1283, 1289 (Pa. 1979), state courts do not have to rely upon deterrence as a rationale for the exclusionary rule. Rather, state courts primarily advance three reasons for the exclusionary rule: (1) privacy, (2) judicial integrity, and (3) deterrence. I examine how state courts using an exclusionary rule analysis in reverse and interstate silver platter cases apply such an analysis under all three rationales.

### A. Privacy Rationale

Under a privacy rationale, the exclusionary rule exists "not to deter or ensure judicial integrity, but to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." *Cardenas-Alvarez*, 25 P.3d at 232 (internal quotation marks omitted). Thus, as the United States Supreme Court previously stated, under a privacy rationale, the exclusionary rule is "part and parcel" of

a search and seizure provision's "limitations upon [state] encroachment of individual privacy." *Mapp*, 367 U.S. at 651.

When state exclusionary rules have a privacy rationale, state courts uniformly have found that the law of the forum state, rather than the law of the situs state, should govern suppression. For example, the Oregon Supreme Court noted that its constitution's "focus . . . is on protecting the individual's rights *vis-à-vis* the government, not on deterring or punishing the excessive conduct of any particular governmental actor, local or otherwise." *Davis*, 834 P.2d at 1012. That court was confronted with a case wherein an Oregon prosecution relied upon a search by Mississippi police in Mississippi that may have violated the Oregon Constitution. *Id.* at 1009-12. The court found that "there is only one place and only one way in which such rights can be vindicated, *viz.*, in Oregon courts and by excluding from use in Oregon prosecutions any evidence obtained in a manner contrary to Oregon's constitutional rules." *Id.* at 1013.[6]

Similarly, the New Mexico Supreme Court has held that its constitution has a privacy rationale for the exclusionary rule. *Cardenas-Alvarez*, 25 P.3d at 232. *Cardenas-Alvarez* was a reverse silver platter case involving a search by federal agents at a border patrol checkpoint within New Mexico. *Id.* at 227. The search by the federal agents may have violated the New Mexico Constitution. Employing an exclusionary rule analysis, the New Mexico Supreme Court held that when a search

> violates the protections guaranteed by our state constitution, however, we will not abandon our guard of those protections in order to accommodate evidence thereby yielded. Although we do not claim the authority to constrain the activities of federal agents, we do possess the authority-and

---

[6] The Oregon Supreme Court ultimately found that there was no violation of the Oregon Constitution, but the court chose first to determine whether the Oregon Constitution applied and only then interpret that constitution. *Davis*, 834 P.2d at 1011-13.

indeed the duty-to insulate our courts from evidence seized in contravention of our state's constitution.

*Id.* at 233; *accord State v. Snyder*, 967 P.2d 843, 848 (N.M. Ct. App. 1998). Finally, while Hawaii employs all three rationale for its exclusionary rule, the Hawaii Supreme Court found that the privacy rights guaranteed by its exclusionary rule should "be given substantial weight when another jurisdiction's law is involved." *Torres*, 262 P.3d at 1020.[7]

## B. Judicial Integrity Rationale

Although there is not one definition of the "judicial integrity" rationale, Justice Brandeis perhaps had the best formulation:

> If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means-to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting); *see also Elkins*, 364 U.S. at 222 (citing the *Olmstead* dissents of Justices Holmes and Brandeis for the "imperative of judicial integrity" as "another consideration" for the exclusionary rule). Just as much as prosecutors and law enforcement officers, courts are part of the government. "[J]udicial integrity would suffer if the courts were to admit evidence illegally obtained." *DeJohn*, 403 A.2d at 1296 (Larsen, J., concurring and dissenting). By admitting such evidence, the court itself becomes a lawbreaker.

Courts analyzing the judicial integrity rationale under an exclusionary rule construct have come to differing conclusions on suppression. Some courts have found that judicial

---

[7] McGlynn argues that a privacy rationale does not necessarily result in suppression "when the evidence was located in the situs state and discovered during the investigation of a situs crime." McGlynn, *supra* at 434. However, in both the case *sub judice* and the cases noted above, the prosecution was taking place in the forum state (indeed, that is what makes it the forum state). Thus, there is no "situs crime." Courts applying an exclusionary rule analysis with a privacy rationale are always adjudicating a "forum crime."

integrity weighs in favor of suppressing evidence obtained in a sister state or by the federal government in a way that violates the forum state's law. For example, the Hawaii Supreme Court found that Hawaii's "courts would necessarily be placing their imprimatur of approval on evidence that would otherwise be deemed illegal, thus compromising the integrity of [the] courts." *Torres*, 262 P.3d at 1019; *cf. Cardenas-Alvarez*, 25 P.3d at 243 (Baca, J., concurring in the result) (invoking the state action doctrine and finding that "state action 'includes action of state courts and state judicial officials'") (quoting *Shelley v. Kraemer*, 334 U.S. 1, 18 (1948)); Tullis & Ludlow, *supra* at 91 (opining that "[u]nless the forum regards judicial integrity as a separate basis for application of the exclusionary rule" evidence obtained in a situs state in conformity with situs law should be admitted under a deterrence analysis).

In contrast, other states with a judicial integrity rationale have found that such reasoning does not tip the scales in favor of suppression. The California Supreme Court determined that judicial integrity would not be compromised by admitting evidence obtained by federal authorities in Pennsylvania in a way that violated California law. That court wrote that "[u]nlike the situation that arises when a seizure contrary to California law occurs in [California], the venture is not lawless, and the government is therefore not profiting from illegal conduct or acting as a law-breaker." *Blair*, 602 P.2d at 748; *see also Mollica*, 554 A.2d at 1328 ("Judicial integrity is not imperiled because there has been no misuse or perversion of judicial process."); *Lucas*, 372 N.W.2d at 737 ("[A]dmission of the tapes does not compromise judicial integrity and does not have the effect of permitting Minnesota to profit from any wrongdoing.").

### C. Deterrence Rationale

Finally, some state courts, like the United States Supreme Court, use deterrence as a rationale for the exclusionary rule. Rather than being an essential part of a

constitutional provision regarding searches and seizures, the exclusionary rule operates "to deter the police from engaging in unconstitutional searches and seizures by removing their incentive to do so." *Blair*, 602 P.2d at 748.

Perhaps the most influential decision using an exclusionary rule analysis with a deterrence rationale is that of the New Jersey Supreme Court in *Mollica*. *See* Logan, *supra* at 311-12. In addition to judicial integrity, as noted above, the New Jersey Supreme Court found that the purpose of its exclusionary rule was "to deter unlawful police conduct." *Mollica*, 554 A.2d at 1328. The case involved federal officials obtaining records in a way that complied with federal law, but violated the New Jersey Constitution; those records were then used in a New Jersey prosecution. *Id.* at 1318-19. The court found that the records should not be suppressed because there was nothing to deter. New Jersey could not deter the situs officers, in this case federal officials, because they had complied with the situs law. *Id.* at 1328.

With regard to the involvement of state law enforcement officers, the court found that the federal officials' actions were "totally independent of [New Jersey] government officers." *Id.* To make this last finding the court used an "intergovernmental agency" analysis. *Id.* at 1329. Although the court cited *Lustig* and *Gambino*, it ultimately noted the following factors:

> Differing relationships and interactions may suffice to establish agency. Thus, antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency.

*Id.* Using this framework, the court affirmed the trial court's ruling that the federal officials had not acted as agents of the New Jersey police. *Id.* at 1329-30.

Other courts applying a deterrence rationale have similarly relied upon an agency or participation analysis in determining whether to suppress evidence, with varying tests for what level of participation will lead to deterrence and, in turn, suppression. On one end of the spectrum, the Illinois Supreme Court requires that there be "evidence of collusion between federal and state agents to avoid the requirements of state law" in order to suppress the evidence. *Coleman*, 882 N.E.2d at 1032. California required that "California law enforcement personnel participate[] in the seizure of the records" with the law enforcement officers of another sovereign. *Blair*, 602 P.2d at 748. *See also Brown*, 925 N.E.2d at 851 ("To the extent that the conduct of State officials is the object of deterrence, our rulings excluding similar evidence obtained through investigations that are essentially State investigations operating under a Federal moniker are sufficient."); *Brown*, 940 P.2d at 578 ("Appellant does not identify any state interest to be advanced by suppressing the recorded statements. No Washington state officer violated [the wiretap statute]."); *accord Bennett*, 369 A.2d at 495 ("Pennsylvania police officers did not participate in any manner in the securing of this wiretap or in the resulting New Jersey surveillance."); *but see Torres*, 262 P.3d at 1020 (writing that "the application of the Hawai'i exclusionary rule factors in future cases would deter any federal and state cooperation to evade state law") (internal quotation marks omitted).

### D. Pennsylvania's Exclusionary Rule

Although Pennsylvania did not adopt an exclusionary rule until after *Mapp*, *see Commonwealth v. Bosurgi*, 190 A.2d 304, 309 (Pa. 1963), "at the time the exclusionary rule was embraced in Pennsylvania, we clearly viewed it as a constitutional mandate," *Edmunds*, 586 A.2d at 897. Like Oregon and New Mexico, Pennsylvania's exclusionary rule is tied primarily to privacy. As we made clear in *Edmunds*:

> During the first decade after *Mapp*, our decisions in Pennsylvania tended to parallel the cases interpreting the 4th Amendment. However, beginning in

1973, our case-law began to reflect a clear divergence from federal precedent. . . . [T]his Court began to forge its own path under Article I, Section 8 of the Pennsylvania Constitution, declaring with increasing frequency that Article I, Section 8 of the Pennsylvania Constitution embodied a strong notion of privacy, notwithstanding federal cases to the contrary. In *Commonwealth v. Platou* and *Commonwealth v. DeJohn*, we made explicit that "the right to be free from unreasonable searches and seizures contained in Article I, Section 8 of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth."

*Id.* at 898 (quoting *DeJohn*, 403 A.2d at 1291). Thus, the inherent aim of the exclusionary rule is the "safeguarding of privacy." *Id.* at 899.[8] Pennsylvania, to a lesser extent, also has embraced a judicial integrity rationale. In *Edmunds*, we wrote that "[t]o allow the judicial branch to participate, directly or indirectly, in the use of the fruits of illegal searches would only serve to undermine the integrity of the judiciary in this Commonwealth." *Id.* at 901.

Applying our privacy rationale in an exclusionary rule analysis, the Pennsylvania Constitution, including Article I, Section 8, should govern suppression motions when

---

[8]    In *Commonwealth v. Johnson*, 86 A.3d 182 (Pa. 2014), we wrote that "the exclusionary rule in Pennsylvania serves other values besides deterrence; it also vindicates an individual's right to privacy." *Id.* at 188. In that case, we found that suppression "would serve some generalized deterrence function." *Id.* at 190. However, while *Johnson* found that suppression would deter the conduct in question, the Court did not actually appear to adopt deterrence as a value underlying Pennsylvania's exclusionary rule.

In any event, since *Johnson*, we have reaffirmed that privacy, rather than deterrence, is the primary reason for our exclusionary rule. *See Commonwealth v. Valdivia*, 195 A.3d 855, 862 n.9 (2018) ("'Article I § 8 . . . generally provides greater protection . . . because the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct.'") (quoting *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010)); *Commonwealth v. Arter*, 151 A.3d 149, 164 (Pa. 2016) (noting "this Court's long-standing interpretation of Article I, Section 8 as embodying a strong individual privacy right"); *see also Commonwealth v. Santiago*, 209 A.3d 912, 939 n.10 (Pa. 2019) (Wecht, J., dissenting) ("Recognizing that Article I, Section 8 of the Pennsylvania Constitution more zealously protects individual privacy rights than the Fourth Amendment to the United States Constitution, this Court has held that our exclusionary rule serves a separate purpose as well: to guard against unwarranted intrusions upon an individual's right to privacy.").

another sovereign's law enforcement officials obtain evidence in violation of the Pennsylvania Constitution.[9] Although decisions from our sister states only "are entitled to whatever weight their reasoning and intellectual persuasiveness warrant," *DeJohn*, 403 A.2d at 1289, the decisions of the Supreme Courts of Hawaii, New Mexico, and Oregon are persuasive. When those courts evaluated a constitution for which the exclusionary rule was based upon a privacy rationale, the courts found that the forum state's constitution should govern (or at least be a prime factor in) the admission of evidence in the forum state's prosecution, regardless of which sovereign[10] conducted the search. Our

---

[9] Tullis and Ludlow outlined three possible scenarios involving interstate silver platters: (1) illegal in the situs state and illegal in the forum state; (2) illegal in the situs state, but legal in the forum state; and (3) legal in the situs state, but illegal in the forum state. Tullis & Ludlow*, supra* at 90-91. Here, we deal with the third scenario, assuming, for the time being, that the recording made by the California police officers was legal under California law and illegal under Pennsylvania law. With regard to the first scenario—where the means of obtaining the evidence would be illegal in both states—it is difficult to imagine why the same rule would not apply.

However, the second scenario—illegal in the situs state, but legal in the forum state—may present different concerns for which a different rule could apply. Such a situation could implicate issues of: (1) "comity to vindicate" a sister state's "sovereignty," *Commonwealth v. Sadvari*, 752 A.2d 393, 398 (Pa. 2000); and (2) the need to evaluate the sister's state rationale for its exclusionary rule, including the possible deterrence of its own law enforcement officers from violating that state's laws. The Pennsylvania Constitution may serve as a floor, though not a ceiling, for the vindication of individual rights in Pennsylvania courts, like the federal Constitution does in state prosecutions. Regardless, we are not confronted with such a scenario in this case.

[10] The Oregon Supreme Court, in *Davis*, encountered an interstate silver platter scenario involving Mississippi police. The Hawaii Supreme Court, in *Torres*, and the New Mexico Supreme Court, in *Cardenas-Alvarez*, dealt with reverse silver platters, where the federal government obtained evidence within the boundaries of the state and possibly in violation of the state's law, but in compliance with federal law. Under an exclusionary rule analysis, however, it should make no difference whether the other sovereign is another state or the federal government, or whether the search took place within the boundaries of the state or in another state. The focus, especially under a privacy rationale, is on the rights of the defendant, not the identity of the sovereign performing the search. As the United States Supreme Court wrote in *Elkins*, "[t]o the victim" of the constitutional violation, "it matters not whether his constitutional right has been invaded by a federal agent or by a state officer." *Elkins*, 364 U.S. at 215; *see also Davis*, 834 P.2d at 1012-13

Constitution[11] makes promises to all those who are subject to its provisions, whether they be criminal defendants or innocent victims, Pennsylvania residents or visitors from other jurisdictions. Those promises must be enforced in our courts if they are to have their intended effects. Any other rule would subject identical defendants to different results depending on which law enforcement official[12] conducted the search.

("It does not matter *where* that evidence was obtained (in-state or out-of-state), or *what* governmental entity (local, state, federal, or out-of-state) obtained it; the constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution."). Additionally, there is no evidence that any federal statutes, such as those dealing with wiretaps, are intended to preempt state law, statutory or constitutional in nature. *See State v. Rodriguez*, 854 P.2d 399, 404 (Or. 1993); *State v. Williams*, 617 P.2d 1012, 1017-18 (Wash. 1980).

Some have called attention to how a state court's application of its own Constitution to a sister state's search could implicate the Full Faith and Credit Clause of the federal Constitution, U.S. CONST. art. IV, § 1. *See* Diehm, *supra* at 257. Our Constitution and our judgments, of course, cannot violate the federal Constitution. *See* U.S. CONST. art. VI, cl. 2. However, as a general matter, the United States Supreme Court has given discretion to states in deciding which law to apply in state courts. *See Sun Oil Co. v. Wortman*, 486 U.S. 717, 727 (1988) ("[I]t is frequently the case under the Full Faith and Credit Clause that a court can lawfully apply either the law of one State or the contrary law of another."); *see also* McGlynn, *supra* at 419-24 (analyzing Full Faith and Credit Clause issues and concluding that "[t]he bottom line for interstate search-and-seizure cases is that states will almost always be doctrinally justified in applying either the law of the situs or the law of the forum to a given dispute"). The Commonwealth, in this case, does not claim that application of the Pennsylvania Constitution would violate the federal Constitution.

[11] We are not presented with a situation in which a Pennsylvania statute, but not the Pennsylvania Constitution, has been violated. The General Assembly can provide greater privacy protections than our Constitution under its lawmaking powers. In such a scenario, an exclusionary rule analysis likely would need to consider the legislature's (rather the Constitution's) reasons for extending those privacy protections. *Cf. Bennett*, 369 A.2d at 495 (implying that the wiretap statute in question had a deterrence rationale by writing that the court could "not influence future wiretaps in New Jersey"); *id.* at 501 (Hoffman, J., dissenting) (writing that the purpose of the wiretap statute was "to protect Pennsylvania citizens' privacy from any electronic intrusion").

[12] Our Constitution and case law recognize that only state action violates Article I, Section 8. The conduct of private individuals has not been subject to suppression. *See Commonwealth v. Corley*, 491 A.2d 829, 831 (Pa. 1985). Some state courts have likened

To the extent that judicial integrity plays a role in the application of our exclusionary rule, the Hawaii Supreme Court's application of that rationale in an exclusionary rule analysis is persuasive. By permitting introduction of evidence in a way that violates our Commonwealth's Constitution, our trial judges would "necessarily be placing their imprimatur of approval" on such evidence. *Torres*, 262 P.3d at 1019. The privacy protections of Article I, Section 8 do not forbid violations only by law enforcement officers, or even prosecutors, but also by judges. "From the perspective of the citizen whose rights are at stake, an invasion of privacy, in good faith or bad, is equally as intrusive. This is true whether it occurs through the actions of the legislative, executive or judicial branch of government." *Edmunds*, 586 A.2d at 901. "Our cases reflect the belief that . . . judges have a distinct mission to perform in actively protecting the right of privacy of the individual." *Wilson v. Schnettler*, 365 U.S. 381, 396 (1961) (Douglas, J., dissenting). And as judges, we take an oath to "support, obey and defend . . . the Constitution of this Commonwealth." PA. CONST. art. VI, § 3. Defense of that Constitution necessarily involves ensuring our criminal trials adhere to its mandates, and those mandates should not "be impaired by judicial sanction of equivocal methods." *Byars*, 273 U.S. at 33. The judicial branch of our Commonwealth's government cannot be complicit in violations of our Constitution.

---

law enforcement officers from other jurisdictions to private actors. *See, e.g.*, *Mollica*, 554 A.2d at 1325. However, law enforcement officers from other sovereigns, whether they be from other states or the federal government, are distinct from private actors. *See Commonwealth v. Price*, 672 A.2d 280, 284 (Pa. 1996) (concluding that an FBI agent stopping a driver constituted state action in a prosecution under Pennsylvania law). "When individuals are forced to stop and be questioned by governmental authority, the invasion to their right to privacy and freedom of movement is compromised, regardless of which governmental entity is actually exerting its power." *Cardenas-Alvarez*, 25 P.3d at 244 (Baca, J., concurring in the result).

## E. The Majority's Agency Analysis

The Majority's agency analysis has the unintended effect of undermining the protections afforded by Article I, Section 8. As noted above, only states with a deterrence rationale engage in any sort of agency analysis with regard to the participation of the forum state's law enforcement officers. *See, e.g.*, *Mollica*, 554 A.2d at 1329. And this makes perfect sense. For the situs state's law enforcement officers, it is unlikely that the forum court could deter their conduct when their actions were performed within the situs state and in compliance with situs law. And for the forum state's law enforcement officers, the only conduct to deter would be if those officers availed themselves of the looser privacy protections of the situs state in order to conduct their investigation. Determining whether the forum state officers wanted to circumvent the more restrictive law of the forum state requires that the court evaluate the level of participation of the forum state officers in the situs state search. If the situs state officers truly handed the evidence over to the forum state officers on a silver platter, with no participation by the forum state officers, then there is nothing for the forum state court to deter. In contrast, if the forum state officers colluded, *see Coleman*, 882 N.E.2d at 1032, or even participated in the situs state search, suppression under the forum state's constitution would have the effect of deterring the forum state officers from circumventing the forum state constitution in the future.

But Pennsylvania is not a deterrence state, as this Court has made abundantly clear.[13] Our exclusionary rule is based upon privacy and judicial integrity. *See Edmunds*,

---

[13] The Majority's decision to determine the legality of the recordings under California law has an additional cost. Not only are we allowing the introduction of evidence based upon a sister state's constitution, but we additionally are allowing that evidence to be introduced because it conforms to the federal Constitution. *See* CAL. CONST. art. I, § 24 ("This Constitution shall not be construed by the courts to afford greater rights to criminal defendants than those afforded by the Constitution of the United States."). Thus, despite

586 A.2d at 898-901. There is nothing for our exclusionary rule to deter. Our Constitution cares not whether suppression of the evidence will stop Pennsylvania law enforcement officers from cooperating with another sovereign's officers in a future case. Our Constitution does not care whether Pennsylvania officers are handed such evidence on a silver platter without any cooperation whatsoever from Pennsylvania officers. Our Constitution "is meant to embody a strong notion of privacy, carefully safeguarded in this Commonwealth for the past two centuries." *Id.* at 897. The privacy of each individual who is criminally tried in our Commonwealth's courts is at the heart of Article I, Section 8. The Majority's agency analysis implicitly shifts Article I, Section 8's exclusionary rule from a privacy rationale to one of deterrence. While I have no doubt that the Majority is committed to upholding the privacy rationale of our exclusionary rule as a constitutional matter, the Majority's engagement with the agency question is short-sighted, having second-order effects beyond the pages of this single opinion. I cannot join that paradigm.[14]

---

our clear command that "Article I, section 8 has an identity and vitality that is separate and distinct from that of the Fourth Amendment," *Commonwealth v. Kohl*, 615 A.2d 308, 314 (Pa. 1992), the Majority's decision has the effect of allowing the introduction of evidence that violates Article I, Section 8, but adheres to the Fourth Amendment, which has a deterrence rationale for its exclusionary rule, *Calandra*, 414 U.S. at 348.

[14] The Majority contends that "examination of whether any Pennsylvania specific constitutional or statutory protections extended to [Britton's] situation is unwarranted." Maj. Op. at 1-2. Britton framed her question in the following manner:

> Should out of state law enforcement officers acting within their own state but solely at the request of Pennsylvania law enforcement officers be considered agents of the Pennsylvania law enforcement and as such governed by the same statutory and constitutional standards as the Pennsylvania law enforcement officers?

*Commonwealth v. Britton*, 194 A.3d 1041, 1042 (Pa. 2018) (*per curiam*). Britton did frame her question to ask whether the California "law enforcement officers be considered agents of the Pennsylvania law enforcement" officers. *Id.* However, the question goes on to ask whether the California officers should be "governed by the same statutory and

constitutional standards as the Pennsylvania law enforcement officers." *Id.* The phrase "as such" connecting the two parts of the question, *id.*, could be interpreted as asking this Court first to look at agency and only then to determine the result under Pennsylvania law, if appropriate. Presumably, this is the Majority's interpretation.

However, a better reading of the question is to ask first what the appropriate type of analysis is regarding evidence obtained by another sovereign's officers and introduced into Pennsylvania court. This interpretation of the question accords with the history of this case. The trial court interpreted Britton's motion to suppress in this way, concluding that a choice of law analysis was appropriate before moving onto the agency question. *See* Trial Ct. Op. at 4-6. Britton's Rule 1925(b) statement argued that the trial court "erred by applying California law to the analysis of whether [Britton's] statements were taken in violation of her rights under . . . Article 1 Sections 8 and 9 of the Pennsylvania Constitution." Statement Pursuant to Pa.R.A.P. 1925(b), 1786 EDA 2017 at ¶ 2(b). Britton saw this question as distinct from the agency question. *Id.* at ¶ 2(a)(i)-(ii). Britton disagreed with the trial court's choice of law analysis in her Superior Court brief. *See* Britton's Brief, 1786 EDA 2017, at 25-26. And the Commonwealth implicitly endorsed the trial court's choice of law analysis in its Superior Court brief. *See* Commonwealth's Brief, 1786 EDA 2017, at 5-8. The Superior Court endorsed the trial court's finding as to its choice of law analysis. *Commonwealth v. Britton*, 1786 EDA 2017, 2018 WL 1165543, at *1 (Pa. Super. Mar. 6, 2018).

In this court, Britton's Petition for Allowance of Appeal argued that the trial court erred in using a choice of law analysis. Petition for Allowance of Appeal, 238 MAL 2018, at 9-11. Britton also wrote that a more appropriate analysis was whether the California officers were "acting as . . . agent[s] of the Pennsylvania law enforcement." *Id.* at 11. But in her brief to this Court, Britton makes three arguments: (1) that the California officers were agents of the Pennsylvania officers, Britton's Brief at 15-16; (2) that a choice of law analysis is not appropriate, *id.* at 27-31; and (3) that this Court should adopt an exclusionary rule analysis, *id.* at 31-36.

Although Britton has not necessarily separated her arguments in an artful manner, she has viewed our grant of *allocatur* as creating two possible vehicles to vindicate her claims, either through a choice of law or exclusionary rule analysis, or alternatively, via an agency analysis. And as the Majority acknowledges, the Commonwealth also interpreted the question granted as encompassing, at the very least, whether the choice of law analysis was appropriate. Maj. Op. at 10 ("[T]he Commonwealth primarily contends that a conflict-of-law analysis . . . applies."); *see also* Commonwealth's Brief at 10-16. The Commonwealth did not argue the agency question. Maj. Op. at 10 ("The Commonwealth's argument is of limited help as it does not squarely address [Britton's] agency argument.").

I agree with the parties that the question presented encompasses more than analyzing whether the California officers were agents of the Pennsylvania officers. The issue about whether to apply the Pennsylvania Constitution is here, and we should decide it. It "has not been waived, was advanced in the Petition for Allowance of Appeal, and

The Majority's agency analysis suffers from an additional flaw: it will be difficult to apply in future cases and will lead to inconsistent results. This is the same flaw that plagued federal constitutional jurisprudence until the United States Supreme Court finally ended the silver platter doctrine. *See Elkins*, 364 U.S. at 212 ("And it is fair to say that in their approach to this recurring question, no less than in their disposition of concrete cases, the federal courts did not find themselves in complete harmony, nor even internally self-consistent."). The Majority cites traditional agency law and finds that there are three factors in determining whether a situs officer acted as an agent of a Pennsylvania officer. *See* Maj. Op. at 14. The Majority concedes that "reasonable minds could differ as to whether" the first two factors apply to this case. *Id.* The very fact that reasonable minds could differ as to two factors here indicates that it will be difficult for our lower courts to apply this test in future cases. I acknowledge that courts must routinely apply the three agency factors in civil cases. But the privacy protections of our Constitution surely must give our residents more exacting notice as to what evidence can be admitted in criminal trials.

Bright line rules have numerous benefits, including easier application in our lower courts, predictability, and notice. *See generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989). The approach of the New Mexico and Oregon Supreme Courts[15] is to create a bright-line rule, consistent with their bright-line

---

has been briefed by both parties, without objection." *Erie Ins. Exch. v. Bristol*, 160 A.3d 123, 124 (Pa. 2017) (*per curiam*).

[15] The Hawaii Supreme Court's approach in *Torres* differed slightly from the New Mexico and Oregon Supreme Courts. The Hawaii Supreme Court ultimately concluded that "due consideration . . . must be given to the Hawai'i Constitution and applicable case law" in deciding reverse silver platter cases. *Torres*, 262 P.3d at 1021. In contrast, both New Mexico, *see Cardenas-Alvarez*, 25 P.3d at 232 ("We hold that when a federal agent effectuates such an intrusion and the State proffers the evidence thereby seized in state court, we will subject it to New Mexico's exclusionary rule."), and Oregon, *see Davis*, 834

privacy rationale. The proposed rule above—that the Pennsylvania Constitution should govern suppression motions for which evidence violated the Pennsylvania Constitution—is such a bright line rule. It will be easy for our trial courts to apply and will give notice to criminal defendants, in addition to conforming to the mandates of our Constitution. In this case, we are grappling with whether a standard designated by the Pennsylvania Constitution should be applied in Pennsylvania courts. The Majority creates an indeterminate test that requires analysis of three different factors. But "when the standard is clear it should be laid down once for all by the Courts." *Baltimore & O.R. Co. v. Goodman*, 275 U.S. 66, 70 (1927) (Holmes, J.). My proposed standard is clear and would prevent recurring appeals requiring more exacting definitions of agency in cases like this.

### IV. Applying the Pennsylvania Constitution

Applying the Pennsylvania Constitution here, I would find that the trial court erred in not suppressing the recordings made by the California police officers in Britton's home because those recordings violated Article I, Section 8 of the Pennsylvania Constitution.

---

P.2d at 1012 ("If the government seeks to rely on evidence in an Oregon criminal prosecution, that evidence must have been obtained in a manner that comports with the protections given to the individual by Article I, section 9, of the Oregon Constitution."), adopted bright line rules.

It is unclear why the Hawaii Supreme Court did not also adopt such a bright line rule, though perhaps it was because Hawaii had three different rationales for its exclusionary rule, including deterrence, and those different rationales had to be weighed in future cases. The concurrence noticed this lack of a bright line rule, writing that "[t]he 'substantial weight' standard is simply too murky for trial courts to utilize and apply consistently." *Torres*, 262 P.3d at 1028 (Nakayama, Acting C.J., concurring and dissenting).

I agree that requiring a trial court to determine, in each case, whether suppression is warranted under an exclusionary rule analysis is unnecessary. Thus, I would adopt the bright line approach of New Mexico and Oregon, especially as, like those states, Pennsylvania does not rely upon deterrence for its exclusionary rule.

**A. The Questioning of Britton in Her Home Violated the Pennsylvania Constitution**

In *Commonwealth v. Brion*, we determined that, under Article I, Section 8 of the Pennsylvania Constitution, "an individual can reasonably expect that his right to privacy will not be violated in his home through the use of any electronic surveillance." *Brion*, 652 A.2d at 289. While *Brion* involved a confidential informant recording the defendant in his home without the defendant's knowledge or consent, *id.* at 287, the protections of Article I, Section 8 equally apply to police officers who use electronic surveillance without the defendant's knowledge or consent in her home, *see Commonwealth v. Ardestani*, 736 A.2d 552, 553-54 (Pa. 1999) (Opinion Announcing the Judgment of the Court) (applying *Brion* retroactively in a case involving a police detective who was fitted with a wire and recorded the defendant in his home).

Two detectives from the San Bernardino County Sheriff's Department interviewed Britton, first at the Morongo Sheriff's Station and then in Britton's home. At the sheriff's station, a sign informed Britton that the interviews would be recorded. Maj. Op. at 4. After the interview at the sheriff's station, the detectives interviewed Britton in her home and returned the next day to conduct another interview. *Id.* During the initial interview, Britton "accepted responsibility for participating in the murder, explained in gruesome detail how she dismembered the body, and laid out how [Britton and her then-husband James Britton] disposed of the remains." *Id.* In both instances, the detectives recorded Britton using a belt recorder, but "never affirmatively informed [Britton] that they were recording the interviews." *Id.* at 5.

This case presents a straightforward application of *Brion*. Because there is no evidence to suggest that the detectives had received a "determination of probable cause by a neutral, judicial authority" for an in-home recording, the evidence from the detectives' belt recorder "should have been suppressed." *Brion*, 652 A.2d at 289.

The Commonwealth argues that Britton had no reasonable expectation of privacy for the interviews recorded on the belt recorder in her home. Commonwealth's Brief at 16-20 (citing *Commonwealth v. Henlen*, 564 A.2d 905 (Pa. 1989)). The Commonwealth avers that, because Britton "invited the detectives specifically to continue with the interview in her home," she had no "subjective and justifiable expectation of privacy in her conversation with the detectives." *Id.* at 19. "To determine whether one's activities fall within the right of privacy, we must examine: first, whether appellant has exhibited an expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." *Commonwealth v. Blystone*, 549 A.2d 81, 87 (1988). The reasonable expectation of privacy test applies in the context of in-home recordings. While *Brion* held that Article I, Section 8 forbids "the use of any electronic surveillance" in the defendant's home without probable cause and a warrant, if the defendant "did not have an expectation of privacy within his home," then Article I, Section 8 does not require suppression. *Brion*, 652 A.2d at 289.

The warnings at the police station do not obviate the requirements of Article I, Section 8 in an individual's home, and Britton's invitation to the detectives to enter her home did not suspend operation of Article I, Section 8's protections. The home is different. "For the right to privacy to mean anything, it must guarantee privacy to an individual in [her] own home." *Brion*, 652 A.2d at 289. Britton did not affirmatively invite the California detectives to record her statements using their belt recorder. And while the Commonwealth cites our decision in *Henlen*, "[u]nlike both *Blystone* and *Henlen*, the instant case involves conversations taking place in the sanctity of one's home." *Id.* Thus, there is no evidence to conclude that Britton did not have a reasonable expectation of privacy for the interviews recorded on the detectives' belt recorder.

However, during the initial interview, one of the detectives "utilized a Sherriff-issued [*sic*] iPad to record a video of [Britton] demonstrating on a stuffed animal the manner in which James killed" Robert Roudebush, the victim. Maj. Op. at 4-5. "Britton further admitted that she was present for and actively participated in [Roudebush's] murder." *Id.* In determining whether the iPad recording violated Article I, Section 8, there is no need to examine "whether that expectation is one that society is prepared to recognize as reasonable." *Blystone*, 549 A.2d at 87. An iPad, unlike a wire, is not an inconspicuous device. Britton could see the iPad recording her actions. *See* Notes of Testimony ("N.T."), 7/12/2016, at 74 (describing one of the detectives as "pull[ing] his iPad out and film[ing] it"); *see also* N.T., 11/2/2016, at 189 (noting that the iPad "is pretty out in the open. . . . Like he can't surreptitiously [record] with an iPad. Like that doesn't work very well."). Thus, she subjectively did not "exhibit[] an expectation of privacy." *Blystone*, 549 A.2d at 87. The iPad recordings were admissible during trial.[16]

**B. Even Under an Agency Analysis, the Evidence Should be Suppressed**

Even if this court were to adopt some sort of agency analysis, in opposition to every other state constitution with a privacy rationale for its exclusionary rule, the interviews from the belt recorders should have been suppressed. While the Majority imports a definition of agency from the civil side of our jurisprudence, *see* Maj. Op. at 14 (citing, *inter alia*, the Restatement (Second) of Agency), I would instead use the agency analysis employed by the United States Supreme Court in *Byars* and its progeny.[17]

---

[16]     Britton does not argue that the interviews and recordings from the sheriff's station violated any provision of the Pennsylvania Constitution, as she contends only that Pennsylvania law should be applied to the in-home recordings. *See* Britton's Brief at 17 ("Surreptitious recordings made *inside of a person's out-of-state home* should be governed by Pennsylvania law . . . .") (emphasis added).

[17]     I acknowledge that *Byars* and its progeny are not binding on this Court if we were to adopt an agency analysis in silver platter cases. *DeJohn*, 403 A.2d at 1289 ("For a state court interpreting a state constitution, opinions of the United States Supreme Court

*Gambino* states that when a search is "made solely for the purpose of aiding the" forum jurisdiction "in the enforcement of its laws," the evidence must be suppressed. *Gambino*, 275 U.S. at 317. Whether the situs state officers "acted under the directions of the" forum "officials in making the arrest and seizure" is of no importance. *Id.* This case does not present a scenario in which the California detectives were interviewing Britton for a crime committed in California and happened to stumble onto Britton's participation in the Pennsylvania murder. Rather, the California detectives conducted the interview "solely" at the behest of the Pennsylvania officers. *See* N.T., 7/12/2016 at 59-60 (describing how the Pennsylvania officers contacted the California detectives and asked them to interview Britton); *see also* Trial Ct. Op. at 11. And, although the Majority concludes that the Pennsylvania officers did not "exercise[] any control over" the California detectives' actions, Maj. Op. at 14,[18] that should play no role in the inquiry.

are like opinions of sister state courts or lower federal courts. While neither binding in a constitutional sense nor precedential in a jurisprudential one, they are entitled to whatever weight their reasoning and intellectual persuasiveness warrant.").

Additionally, as noted above, the United States Supreme Court overruled the silver platter doctrine *in toto*, including any agency analysis, even as it was shifting towards a deterrence rationale for the Fourth Amendment's exclusionary rule. *See Elkins*, 364 U.S. at 217 ("The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."). This adds further support for my belief that an agency analysis is inappropriate under the Pennsylvania Constitution, which does not even have a deterrence rationale.

[18] I do not necessarily accept the proposition that, because the Pennsylvania officers did not direct the California detectives to use the belt recorder, there was no agency relationship. "It is fundamental agency law that an act outside the scope of one's authority may be ratified by the subsequent conduct or behavior of the principal on whose behalf one purports to be acting." *Commonwealth v. Eshelman*, 383 A.2d 838, 842 (Pa. 1978); *cf. Lustig*, 338 U.S. at 78 (plurality) ("To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment."). The record shows that the Pennsylvania officers were made aware of the California detectives' use of the belt recorder and allowed the detectives to continue interviewing Britton. *See* N.T.,

Thus, per the reasoning of the United States Supreme Court in *Gambino*, the law of the forum jurisdiction—in this case, Pennsylvania—should apply, and the trial court erred in not suppressing the belt recordings.

### V. Harmless Error

As its final argument, the Commonwealth contends that, even if the trial court erred in admitting the recordings from Britton's home, that error was harmless. *See* Commonwealth's Brief at 20-22.

As we recently noted:

> Harmless error exists if the Commonwealth proves that (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Frein*, 206 A.3d 1049, 1070 (Pa. 2019). The harmless error doctrine applies to constitutional errors. *Commonwealth v. Story*, 383 A.2d 155, 163-64 (Pa. 1978). "[T]he burden of establishing that the error was harmless beyond a reasonable doubt rests with the Commonwealth." *Id.* at 162 n.11.

The Commonwealth avers that other evidence in the case was sufficient to support Britton's guilty verdict, specifically: (1) that the California detectives "could have testified to the statements from their own recollection," Commonwealth's Brief at 21; (2) that Britton told a Pennsylvania officer "the same version, that she was, in fact, present at the time that her ex-husband murdered the victim," *id.* at 22; (3) the iPad video; and (4) a consensual search of her phone that revealed text messages involving incriminating

_____

7/12/2016, at 60 ("I remember telling [Pennsylvania Trooper McAndrew] after" about the belt recorder.); *id.* at 62 (acknowledging that Trooper McAndrew "continued to ask for [the] assistance" of the California detectives "in the matter," even after learning that the conversations had been recorded).

communications with her ex-husband. Because the California detectives' testimony regarding the same information that was recorded in Britton's home could implicate the independent source doctrine, *see Commonwealth v. Melendez*, 676 A.2d 226 (Pa. 1996), I believe that it is prudent not to consider any evidence gleaned from Britton while the California detectives were using the belt recorder.

Even without Britton's statements made in her home, "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." *Frein*, 206 A.3d at 1070. First, one of the Pennsylvania officers described at trial how Britton "admitted to now being a participant and being present when the murder happened" in a phone call on August 18, 2015. N.T., 11/4/2016, at 117. Britton also admitted that she had lied in past interviews and to a grand jury. *Id.* at 110, 117. Second, the iPad video revealed that "Britton demonstrated with a stuffed animal [her ex-husband's] actions and the way [the victim] was laying, so she played [her husband], and then [the victim] was played by a stuffed animal that she had in the house." N.T., 11/3/2016, at 24-25. The video depicted how Britton's husband "murdered" the victim, demonstrating that Britton was present during the murder. N.T., 11/2/2016, at 189; *see also* N.T. 11/7/2016, at 46-47 (describing the iPad video in further detail). Third, Britton consented to a search of her phone which revealed text messages from her ex-husband. N.T., 11/2/2016, at 185. Britton and her ex-husband discussed the murder, with Britton mentioning the possibility of "call[ing] the state police," presumably referring to the Pennsylvania authorities. N.T., 11/3/2016, at 5-6.

The jury had ample evidence to conclude, beyond a reasonable doubt, that Britton had participated with her ex-husband in murdering the victim. Thus, the trial court's error

in not suppressing the tapes of the belt recorders in violation of Article I, Section 8 of the Pennsylvania Constitution was harmless.

## VI. Conclusion

I am confident that the Majority believes that Article I, Section 8 of the Pennsylvania Constitution "is tied into the implicit right to privacy in this Commonwealth." *DeJohn*, 403 A.2d at 1291. But by engaging in an agency analysis to determine whether evidence obtained by California law enforcement officers should be suppressed in a Pennsylvania court, the Majority undermines that right to privacy and begins to shift our exclusionary rule to a deterrence rationale. While I believe that the Majority's analysis is not a "purposeful rejection[] of the historical objective and purpose of the rule," *Calandra*, 414 U.S. at 356 (Brennan, J., dissenting), it is still a dangerous path to take.[19]

"[T]he right to be let alone" is "the most comprehensive of rights and the right most valued by civilized men" and women. *Olmstead*, 277 U.S. at 478 (Brandeis, J.,

---

[19] Rather than engaging with my contention that an agency analysis is appropriate only in a state with a deterrence-based exclusionary rule, the Majority writes that I am "ponder[ing]" the Majority's "intent" and "mak[ing] unwarranted accusations that" the Majority is "undermining the protections of the Pennsylvania Constitution." Maj. Op. at 15 n.7. The above paragraph makes clear that I do *not* believe that the Majority's decision to perform an agency analysis is a "purposeful rejection" of our exclusionary rule's privacy rationale. *Calandra*, 414 U.S. at 356 (Brennan, J., dissenting).

While I do take issue with how the Majority answers the agency question, *see* Part IV.B, *supra*, the thrust of this opinion is about the Majority's decision to undertake an agency analysis at all. As described above, an agency analysis makes sense only in a deterrence state. We do not live in a deterrence state. Thus, this Court should not perform an agency analysis.

The Majority claims that it is "focusing on the narrow issue presented to the Court" and "not reach[ing] any constitutional issue." Maj. Op. at 15 n.7. That could be true if today's ruling were restricted to the four corners of the Majority's opinion. But when this Court speaks, we do not speak just for the parties in any individual case, or even just for future cases that come to this Court. Rather, we give guidance to all those who must interpret, practice, and apply the law in our Commonwealth. Lower court judges, attorneys, and law enforcement officers (not to mention laypersons) look to this Court and

dissenting). While that right to be let alone is protected by the Fourth Amendment of the United States Constitution, our system of federalism in the United States ensures that "a double security arises to the rights of the people." THE FEDERALIST NO. 51 (James Madison). Article I, Section 8 is that double security. It guarantees that our law enforcement officers, our prosecutors, and our courts do not violate that essential component of liberty. Enforcement of Article I, Section 8 and its corresponding exclusionary rule is not always easy. It "may place a duty of thoroughness and care upon police officers and district justices in this Commonwealth." *Edmunds*, 586 A.2d at 906. But "that is a small price to pay . . . for a democracy." *Id.* Article I of our Constitution declares those fundamental rights that we enjoy as residents of this Commonwealth. In

---

its opinions when they want to understand the rights afforded by Article I of our Constitution. By engaging in an agency analysis, the Majority is leading those judges and attorneys and law enforcement officers down the wrong path.

If a defendant were to bring a claim that the search of his home violated the British Constitution, despite there being no reason to apply the British Constitution in the case, I am confident that this Court could answer that "narrow issue" by researching British precedent. But determining whether the British Constitution is violated would not be part of our job description. As justices of the Pennsylvania Supreme Court, we interpret the Pennsylvania Constitution. As with the British Constitution, an agency analysis is foreign to the Pennsylvania Constitution because of our continued reliance upon a privacy rationale for our exclusionary rule.

Although Britton has raised the agency issue, ultimately Britton and the Commonwealth have debated and asked this Court to answer the question of whether the Pennsylvania or California Constitutions should govern this case. "But answers are not obtained by putting the wrong question and thereby begging the real one." *Priebe & Sons v. United States*, 332 U.S. 407, 420 (1947) (Frankfurter, J., dissenting). The Majority presumes that an agency analysis is appropriate under our Commonwealth's Constitution. It is not. This Court instead should consider the real question at issue in this case: whether the Pennsylvania Constitution should apply in Pennsylvania courts.

our privileged position as interpreters of that Constitution, we should do all that we can do to protect those rights.

Although I concur with the Majority in affirming the decision of the Superior Court based upon the harmless error doctrine, I cannot join the Majority's agency analysis.